## MATTIE D. GIBSON, APPELLEE, v. VINCENT H. GIBSON, APPELLANT.

1. **Referee:** REPORT: EXCEPTIONS: NEW TRIAL. The cause was referred by consent of parties to a referee, to make findings of the law and of the facts and report the same to the court. The referee proceeded to take the testimony as presented by the parties, which, by the aid of a short-hand reporter, was reduced to writing, and, together with the findings and report of the referee, was filed in the clerk's office. At the next term of the court the cause was brought up, on the motion of the defendant, to confirm the findings and report of the referee. Exceptions to the report of the referee on the part of the plaintiff having been previously filed, together with a motion to vacate the report of the referee, and for a new trial, the motion of the defendant to confirm the report being disposed of, was overruled. Thereupon the court sustained the exceptions of the plaintiff to the referee's report, and granted a new trial. *Held*, No error, and sustained.

2. ———: ———: ———: BILL OF EXCEPTIONS. Thereupon the defendant moved to strike out the evidence reported by the referee, for the reason that the same was not preserved in a bill of exceptions, which motion was overruled. *Held*, No error.

3. **The Final Judgment** for the plaintiff, *Held*, To be sustained by the evidence and law of the case.

APPEAL from the district court of Holt county. Heard below before TIFFANY, J.

*J. B. Strode,* for appellant, cited cases stated and commented upon in the opinion.

*Uttley & Benedict,* for appellee, on validity of the marriage, cited: Comp. Stat., Ch. 52, Secs. 1, 14, and 17. Field's Lawyers' Briefs, 112. 1 Bishop Marriage and Divorce, Sec. 13. Stewart Marriage and Divorce, Sec. 28. *Patterson v. Gains,* 6 How., 550. *Blanchard v. Lambert,* 43 Iowa, 228.

COBB, J.

This cause comes up on appeal from the district court of Holt county. The following is a copy of the amended petition upon which the cause was tried:

"The plaintiff complains of defendant, and for a cause of action says:

"1st. That on or about the 2d day of August, 1881, at the city of Chicago, Cook county, Illinois, the plaintiff, relying on the representations and professions of the defendant made at that time and prior thereto, met this defendant at Chicago on the date aforesaid, and, as the plaintiff then and has ever since believed, that this plaintiff and defendant were legally and lawfully married by a lawful and qualified clergyman.

"2d. That from the time of the performance of the ceremony at and in the city of Chicago as aforesaid, and for the period of two weeks, at the Briggs House in said city of Chicago, as aforesaid, the plaintiff and defendant lived and conducted themselves as man and wife.

"3d. That from that time until the first of January, 1884, relying upon the representations of the defendant, and to please and gratify him, fully believing, from the

statements and letters of the defendant to the plaintiff, that they were legally married, and for some reason, to plaintiff then unknown, the marriage of plaintiff and defendant was kept a secret from his friends, this plaintiff following the vocation of school teacher in Nebraska, and the defendant that of merchandise in various places and towns in Iowa and Nebraska.

"4th.    That in January, 1884, pursuant to a request of the defendant, this plaintiff, still believing that they were legally and lawfully married, met the defendant at Omaha, Nebraska, as his wife, for the purpose of arranging their future plans and arrangements, and remained with him as his wife for a period of about three weeks, at this time fully believing, from the representations of the defendant, that they were legally and lawfully married, and at this time their marriage was made public.

"5th.    That again, in the month of April, 1884, the plaintiff still believing that they were legally and lawfully married as aforesaid, this plaintiff again met the defendant as his wife at Lincoln, Nebraska, and did then and there introduce the defendant, with his assent, to one R. R. Randall, a friend of plaintiff's, as the husband of plaintiff, and the defendant in turn was introduced as the husband of plaintiff by Mr. Randall to his (Randall's) wife, and a lady friend, and all without any objections or protest on the part of defendant.

"6th.    That at this time, viz., in the month of April, 1884, the defendant, as the husband of plaintiff, accompanied the plaintiff to her home and among her friends and relations, and the plaintiff, fully believing that they were legally and lawfully married, and relying upon the statements and protestations of defendant, as he did then and there still accept, and has at all times since the performance of the marriage ceremony in Chicago as aforesaid accepted and claimed defendant as her lawful husband, and did then and there, to her brothers and sisters, mother,

and friends, introduce defendant, and represent him as her lawful husband, with and by the approval of defendant.

"7th. That at the time of the performing of the marriage ceremony at Chicago, as aforesaid, the defendant was the owner of considerable real estate and personal property, and has since the time of the performance of said marriage ceremony, and up to the present time, been the owner of considerable real estate, in which the plaintiff has a dower interest.

"8th. That during the past year the defendant has entirely ignored this plaintiff every way, and has repeatedly denied to the friends of this plaintiff that this plaintiff and defendant were husband and wife, and claims and declares that this plaintiff and defendant were never married, and the defendant for the past year has absolutely refused to recognize the plaintiff, and has denied her all the rights and privileges of a wife.

"Wherefore the plaintiff prays that the court will examine the allegations herein set forth, and the proofs of the parties hereto, and that upon a final hearing that the court may decree that the marriage of the plaintiff and defendant at Chicago in August, 1881, was a legal and lawful marriage, and that from that time this plaintiff was and now is entitled to all the privileges and rights of a married woman, as well to her dower interest in all the real estate of the defendant as in all other things, and for such other and further relief as the court shall deem right and just in the premises."

The defendant answered with a general denial of the plaintiff's allegations.

The cause was referred to N. A. Rainbolt, one of the attorneys of the court, appointed by consent of the parties as referee to take testimony and report findings as to the law and the facts to the court below.

Subsequently the referee made his report, with the testimony, as follows:

"The undersigned would respectfully report that in pursuance of his appointment as referee in the above entitled cause, a certified copy of which furnished him is hereto attached, he fixed the 12th day of May, 1886, at nine o'clock in the forenoon, at the office of the clerk of said court, as the time and place of hearing said cause, and issued the notice hereto attached marked Ex. 'A,' and had the same served upon each of said parties ten days before the time set for hearing said cause, as will appear by the written acceptance of said parties endorsed on said notice.

"That at the time and place fixed for said hearing, to-wit: 9 o'clock A.M. of May 12, 1886, at said clerk's office in said county, said cause was called, the plaintiff appearing in person and by her attorneys, Messrs. Uttley & Small, and the defendant appearing in person and by his attorney, Hon. M. P. Kinkaid, for the sake of convenience the hearing was by consent and agreement of both parties and the referee adjourned to the office of M. P. Kinkaid, in the town of O'Neill, in said county, to which place said parties and the referee repaired. It was then and there agreed that the oral testimony and exhibits there introduced should be taken down in short-hand by Arthur L. Warrick, and by him afterwards transcribed into long-hand when needed in further progress of this cause. The said Arthur L. Warrick being present was duly sworn to faithfully and properly perform his duties as short-hand reporter, and then took in short-hand all the oral testimony introduced on the trial of said cause, and marked and filed and preserved all the exhibits offered by either or both parties in evidence.

"The undersigned further reports that, after hearing all the evidence introduced on the trial of said cause, the oral arguments of counsel and their written briefs, and after considering the whole case, his findings of facts are as follows, to-wit:

"1st. That the plaintiff and defendant were not mar-

ried in the city of Chicago, Ill., at or near the time alleged in plaintiff's petition.

"2d. That no marriage was ever solemnized or pretended to be solemnized between the parties at any time. ·

"3d. That plaintiff and defendant never announced themselves as husband and wife, or made known or represented to the public that they were husband and wife until two or three years after the time of the claimed marriage.

"4th. That plaintiff and defendant never lived together continuously as husband and wife.

"5th. The record discloses no instance when they recognized each other as husband and wife until near three years after the time of the alleged marriage, and about the time when the plaintiff claimed to be in an interesting condition, and that recognition was to a few persons only, and for a short time.

"6th. If the parties were married in Chicago as alleged, no sufficient reason is given why it was not made known, or why it was kept secret.

"From the foregoing findings the referee concludes as matters of law:

"1st. That plaintiff has no cause of action, and that this cause should be dismissed.

"2d. That the holding out to a few persons for a limited time under the circumstances in this cause did not constitute the legal relation of husband and wife between the parties to each other, both knowing it was simulated for a purpose, conceding that the purpose was brought about by good faith and representations made by one to the other. All of which is respectfully submitted,

"N. A. RAINBOLT,

"Referee."

The defendant filed his motion asking that said report be confirmed. Plaintiff filed her objections in writing to said report and asked that the report be set aside, and that the court examine the evidence taken in the case and ren-

der such judgment on the facts and the law as the case requires, regardless of the report of the referee.

The plaintiff's exceptions, seventeen in number, are directed to the form as well as the substance of the report. It is not deemed necessary to copy them at length here, but I will observe that their due consideration by the court to which they were addressed involved an examination of the evidence taken by the referee, as well as the record proper, and the law of the case.

And the court, on the 15th day of June, 1886, after hearing argument of counsel upon the motion to confirm and the motion to set aside, took the same under advisement.

On the 2d day of September, 1886, the defendant filed his motion asking the court "to strike what purports to be the reporter's transcript of the testimony taken in this action from the records, for the reason that the same is not authenticated as a bill of exceptions, and has not been settled and allowed as a bill of exceptions by N. A. Rainbolt, referee herein." This motion the court overruled and defendant duly excepted.

"Thereupon the cause came on for hearing on the objections of plaintiff to the report of the referee filed herein, and the court after hearing the arguments of counsel and being fully advised in the premises, does sustain the objections of the plaintiff to such report, and it is ordered and adjudged by the court that the report of said referee be, and the same is hereby set aside. And upon consideration of the evidence in the cause, the court finds from the evidence as follows:

" 1st. That the plaintiff, at the request of the defendant, went to Chicago, Illinois, on or about the 2d day of August, 1881, for the purpose of getting married and settling down there, and remained as the wife of defendant for the period of about two weeks, stopping at the hotel in said city as the wife of the defendant.

"2d. That after such apparent marriage in Chicago, and on or about the 4th of April, 1884, the defendant openly acknowledged the plaintiff as his wife, and that he, the defendant, was introduced as the husband of plaintiff.

"3d. That the defendant has frequently, during all the time since the date of said open acknowledgment, the defendant has written and addressed letters to the plaintiff to various places, as Mrs. Mattie D. Gibson, which were transported and delivered through due course of mail. To which of each findings of facts and law, counsel for defendant severally excepts. It is, therefore, considered by the court that plaintiff is entitled to the relief prayed, and it is ordered and decreed by the court that the marriage of the plaintiff with the defendant be, and the same is hereby declared legal and binding in all respects, and the defendant pay the costs of this action taxed at $92.50, to which finding of law and judgment defendant duly excepts."

On the 3d day of September, 1886, defendant filed his motion for a new trial, containing the following:

"1st. There was irregularity in the proceedings in this: The court erred in overruling the motion of the defendant to strike what purported to be a transcript of the testimony made by the official reporter or stenographer from the files, because the same had not been settled as a bill of exceptions by the referee, N. A. Rainbolt.

"2d. The court erred in setting aside the report of the referee filed herein, upon the law found by said referee.

"3d. The court erred in setting aside the report of the referee upon the facts found by said referee.

"4th. The court erred in finding for the plaintiff on the law.

"5th. The court erred in finding for the plaintiff upon the facts in this case.

"6th. The court erred in not finding for the defendant, and the decision of the court should have been in favor of the defendant.

26

"7th.    The finding of the court upon the facts is not sustained by weight of the evidence.

"8th.    The decision of the court should have been in favor of the defendant.

"9th.    The finding of the court marked first, second, and third, is not sustained by the weight of the evidence.

"10th.    The decision of the court upon the facts is contrary to law."

On the 6th day of September, 1886, the court overruled said motion and defendant duly excepted.

The court attaches the following certificate to the bill of exceptions:

"I hereby certify that the transcript of the evidence, marked exhibit 'A,' and the amendment offered thereto by the plaintiff, marked exhibit 'B,' is all the testimony considered by me in determining the above entitled case.

"I further certify that the defendant presented to me for allowance as a bill of exceptions, exhibit 'A,' within the time allowed by law, after the final adjournment of the term of the district court of Holt county, at which said case was by me determined, and at the same time plaintiff presented to me, to be made a part of said bill of exceptions, said exhibit 'B' as an amendment to the bill of exceptions prepared by defendant, and any action in considering said bill of exceptions has been delayed until the present time, for which defendant herein is in no manner accountable, and is not in fault.    The said testimony considered in this bill of exceptions, included in exhibits 'A' and 'B,' is the identical testimony, or pretended testimony, at which the motion of the defendant to strike from the files, because the same had not been settled and preserved by a bill of exceptions by the referee, whom it was claimed by plaintiff had taken it, and the same had not been preserved by a bill of exceptions previous to my acting upon and considering the same as evidence, which motion was overruled by me, to which defendant duly excepted, and

the contents of said exhibits 'A' and 'B' were considered by me as evidence, and the said exhibits were found by me with the files of said case, and no testimony was taken by me in said action, and said exhibits 'A' and 'B' were considered by me as evidence against the objections and exceptions of defendant.

"The said bill of exceptions included in exhibits 'A' and 'B' is now allowed and ordered to be made a part of the record over the objection of the plaintiff; that the court has no authority to allow the same, the case having been tried to a referee, to which order plaintiff excepts.

"Done in chambers in the ninth judicial district in the state of Nebraska, this first day of March, in the year of our Lord 1887.

"(Signed) F. B. TIFFANY,
"*Judge.*"

The defendant below brings the case into this court on appeal.

The first question presented by this appeal is, was it error on the part of the district court to set aside the findings and conclusions of the referee, and proceed to consider and dispose of the case, using the evidence taken and reported by the referee as the foundation and basis of such consideration and disposal? In order for the court to act upon the exceptions to the findings of the referee, as reported by him, it necessarily had before it the evidence taken before the referee, and reduced to writing by Arthur L. Warrick, under his authority and direction, as stated by said referee in his report, as showing the evidential facts of the case, and as the basis of its action in the disposal of the questions raised by said exceptions. This need not be, as I understand the law, as a technical bill of exceptions, but it came before the court as a part of the report or case made by the referee, and necessarily came up for examination and adjudication upon the report and findings of the referee being attacked by exceptions on the part

of either party.   The court thus having the evidence be-
fore it for one purpose, had it for all the appropriate pur-
poses of the case.   Having reached the conclusion that the
exceptions, or some of them, taken by the plaintiff to the
findings and report of the referee must be sustained, was
it incumbent upon the court to set aside all of the work of
that officer ?   Having for good reason rejected the con-
clusions reached by the mind of the referee, must his
mechanical skill, and that of his reporter, in taking the
evidence of witnesses and arranging, numbering, and iden-
tifying the exhibits, be also rejected ?   I think not.

The referee is created by an order of court (in this case
by consent of parties), which alone gives him an existence.
He has no other judicial sanction, and his authority is that
conferred by the code of civil procedure and the rulings of
the court.   Even thus empowered, his judicial capacity is
limited to that more convenient and expedient information
and assistance he may be able to render the court in con-
troversies referred to him.   His report may become the
adjudgment of the court, if his proceedings are strictly in
conformity to legal rules and a discriminating legal judg-
ment; but he borrows from his employment none of the
special attributes of the judge or the court.   He is the
successor, by another name, of the examiner of the equity
courts, and his functions are analogous to those of master
in chancery.   The inquiries directed to the master, says
a respected authority, were so varied in their nature that
it was not possible to point out the rules by which each
was to be pursued.   It was his duty generally to meet all
the difficulties that might arise in the discharge of his
examinations.   He must provide that all accounts and in-
dustries directed by the decree be fully taken and reported.
He was obliged to obey the instructions of the court, and
if he disregarded the instructions, or failed to furnish the
facts necessary to proceed to final decree on the merits, the
report was set aside, even if no objections were taken to

it. But where a matter of fact, upon conflicting evidence and the credibility of witnesses, was before him, his report was not interfered with, or his mere judgment of facts, unless it was a plain case of error, mistake, and injustice. 2 Daniels Ch. Pr., 1215.

It has been held that in each case of a master the rule for his guidance was the decretal order of the court; that he was not appointed merely to take testimony, but to receive and adjudicate upon the force and effect of evidence, to ascertain the facts and form an opinion of the law thereon, both of which constitute his findings and the subject-matter of his report. So that if his legal conclusions are not sustained by the facts, the court may interpose its own judgment and correct the error. 1 Barb. Ch. Pr., 548. *Howe v. Russell*, 36 Me., 115. *Simmons v. Jacobs*, 52 Me. 147.

These were the original powers and uses of the referee, which are now merged in the statutory provisions of the code (Sec. 298), that, "All or any of the issues in the action, whether of fact or law, or both, may be referred, upon the written consent of the parties;" and (Sec. 300) that, "the trial before referees is conducted in the same manner as a trial by the court, with the same power to summon and enforce the attendance of witnesses, to administer all necessary oaths, and to grant adjournments as the court upon such trial. They must state the facts found and the conclusions of law separately, and their decision must be given, and may be excepted to and reviewed in like manner. The report of the referees upon the whole issue stands as the decision of the court, and judgment may be entered thereon in the same manner as if the action had been tried by the court. When the reference is to report the facts, the report has the effect of a special verdict." This is further qualified and defined in subsequent sections of the same title (Sec. 301), that, "in all cases of reference the parties may agree upon a suitable

person or persons, not exceeding three, and the reference shall be ordered accordingly;" and (Sec. 303) that, "it shall be their duty to sign any true exceptions taken to any order or decision by them made, and return the same with their report to the court;" (Secs. 307 *et seq.*) that "an exception is an objection taken to the decision upon a matter of law, to be taken at the time, reduced to writing, with so much of the evidence as is necessary to explain it; no particular form is required, and the whole as briefly as possible." It is further provided (Sec. 310) that, "where the decision objected to is entered on the record, and the grounds of objection appear in the entry, the exceptions may be taken by the party causing to be noted, at the end of the decision, that he excepts."

It will be seen that these provisions are directory as to the duties of the referee, leaving him free to follow his own judgment, excepting the mandatory words that he *must* state the facts and conclusions separately, that he *must* give his decision, and that he *shall* sign any *true* exceptions taken, and return the same with his report.

To recapitulate: The work of the referee derives nothing from his authority. If his findings and conclusions follow the facts as shown by the evidence and the law arising from such facts, it is the duty of the court to affirm and carry them into judgment—not upon the authority of the referee in cases of exceptions, but upon the evidence reported by him. But in case the findings and conclusions reported by the referee do not follow the facts as established by the evidence taken before him, or the law arising from such facts, and the court so holds, must it set aside the work of the referee to which there is no exception, and which could scarcely be so well done under the immediate direction of the court itself? To do so would be to throw away both time and expense. I think it the more logical conclusion that, the court having rejected the work of the referee only so far as it consisted in his mental and quasi-

judicial findings and legal conclusions, he might and should
retain the result of his mere ministerial labor, in taking
down the evidence and arranging and preserving the ex-
hibits for use in the further proceedings in the case. This
question appears to have been directly presented to the
court below by the motion of the defendant to strike out
the evidence reported by the referee. Counsel urge the
overruling of this motion by the court as error, but they
do not discuss the effect of the allowance of such motion in
a case where, as in this, the court could not sustain the
findings and conclusions of the referee, but, apparently
realizing the difficulty involved in the situation, suggest
that: "Judgment ought to have been entered upon the
report of the referee in favor of defendant, and upon
plaintiff's exceptions duly taken, and her application for a
new trial, the court, in its discretion, could have granted
it." To this proposition counsel cite Sec. 314 of the code.
Bearing in mind that it is not necessary to the right or
power of a court to grant a new trial that a final judgment
be first entered in the case, let us test the action of the court
below by the letter of the section of the code above cited.
It provides that: "A new trial is a re-examination in the
same court of an issue of fact after a verdict by a jury, re-
port of a referee, or a decision by the court. The former
verdict, report, or decision shall be vacated and a new trial
granted, on the application of the party aggrieved, for any
of the following causes affecting materially the substantial
rights of such party: * * * *Sixth.* That the verdict,
report, or decision is not sustained by sufficient evidence,
or is contrary to law. * * *" I have only deemed it
necessary to copy the sixth cause for granting a new trial,
that being the one applicable to the case at bar. Now, in
this case, there had been a report of a referee ; the party
aggrieved made an application for a new trial. Whatever
name she or her counsel called it by, that was substantially
what she applied for, and the ground was, that the report

was not sustained by sufficient evidence. In other words, that the evidence would sustain a report in her favor, and would not sustain one against her. The court agreed with her in opinion, and vacated the "former" report. As before stated, in order to hear and determine this application of the party aggrieved, otherwise called her exceptions to the report, the court necessarily had before it the evidence, and all the evidence upon which such report was founded. This evidence is stated by the record to have been filed in the cause. It therefore was a part of the files of the court, and though no part of the record proper, I have always understood that a court would take judicial notice of its own files. The section of statute above referred to as cited by counsel for appellant places the report of a referee upon an equality with the verdict of a jury, in respect to power and duty of the court to vacate the same and grant a new trial upon either of the several grounds therein specified. In cases where there is a verdict it is never held to be necessary that the evidence be preserved by bill of exceptions as a condition precedent to its being examined and considered by the court on a motion for a new trial. But it may be said, and I accord great weight to the position, that in the case of a verdict the evidence has already passed the judicial, as well as personal, observation and scrutiny of the court in its admission to the jury, and that therefore a bill of exceptions may be dispensed with in that case, while it may not be where the evidence has been admitted by a referee. It is conceded that in cases where the report of the referee is confirmed by the district court, and judgment rendered in accordance therewith, and such judgment is attacked in the supreme court for error of the referee in the admission or rejection of evidence, there must be not only a bill of exceptions signed by the referee, but it must appear therefrom that the action of the referee in the rejection or receipt of such evidence was excepted to at the time. But in the case at bar no act or omission of the

referee, either excepted to or not excepted to, is sought to
be presented for review to the supreme court.   It is the
acts of the district court that are called in question here.
These are duly presented by a bill of exceptions.   It is
nowhere suggested that all of the evidence taken before
the referee, as well as all the depositions and pleadings in
the case, were not before the district judge, or duly con-
sidered by him, in point of fact.   The precise question
involved does not appear ever to have been presented to
the supreme court of Ohio, but I cite the cases of *Bell v.
Crawford*, 25 O. S., 402; *Cincinnati v. Cameron*, 33 Id.,
336; and *Williams v. Stevens*, 1 Cincinnati Superior Court
Reporter, 176, as somewhat in point, and to that extent
sustaining the views above expressed.

The appellant's motion to strike the testimony taken by
the official reporter from the files, because the same had
not been settled as a bill of exceptions by the referee, was
therefore properly overruled.   As to the evidence itself, it
was taken, in the manner and form as returned, by the
agreement of parties, in the presence of the referee, who
presided from day to day, ruled on the motions of counsel,
and allowed and noted exceptions in writing.   The whole
is a journal of the trial and its proceedings, and may be
deemed a sufficient bill of exceptions, for the purposes of
the court below, under Sec. 310 of the code, above cited.
That the referee avoided its settlement, if that inference
follows, may lessen its material form, but does not lessen
or suppress its material substance.

There is high authority, here with us, that, "the object
of a bill of exceptions is to bring into the record matter
which otherwise would not be a part of it, and when the
entire proceedings have been entered at length on the jour-
nal of the court, no bill of exceptions is necessary."   So
far as this trial before the referee was "conducted in the
same manner, with the same powers as the court," in con-
formity to Sec. 298 of the code, above cited, the testimony

taken by the official reporter, and exceptions therein, constituted the entire proceedings entered at length on the journal of the referee. No further bill of exceptions was necessary to bring the record of the testimony to the knowledge of the court. It was supplemental to the referee's report—the voucher for it, and material to it; it was the evidence in the case, on the files, and in the hands of the court. By reporting it to the court the referee gave it the same authenticity that his signing it as a bill of exceptions under the most technical form of practice would have done. It was not, then, to be considered as an irregularity of the proceedings below.

Counsel for the appellant has cited the case of *Light v. Kennard*, 10 Neb., 330, in which it was held that, " as a trial before a referee is conducted in the same manner as before the court, exceptions may be taken to any order or decision made, the bill to be signed by the referee, who is the proper party to certify to such exceptions. The court cannot know whether or not the exceptions were taken as therein stated. The report of the referee may be reviewed on the exceptions taken during the trial, as well as those to his findings and conclusions of law." Nothing is now held, here, adverse to that decision.

So, in the case of *Turner v. Turner*, 12 Neb., 161, where it was held that the bill of exceptions is not to be signed by the judge, and is not subject to the provisions of Sec. 311 of the code, but that the " referee's certificate must show that the bill of exceptions contains all the evidence, in order to review the findings," there is nothing now held contrary to that decision, for it will not be denied that all the evidence was before the court below.

The case of *Tingley v. Dolby*, 13 Neb., 371, cited by the appellant, is a repetition of the old New York rule that, " the court has no sufficient authority to set aside the report of the referee except for cause," and is *non sequitur* in the argument, without application or force. It will

be discovered whether there was sufficient cause in this case.

In *Tyson v. Wells,* 2 Cal., 131, cited as authority, the court said : "Our statute concerning referees is in aid of the common law remedy by arbitration, and does not alter its principles; awards of arbitrators and reports of referees may be set aside for fraud, mistake, or accident, of law or fact, on the face of the award or report of the referee ; but courts would not make the inquiry by evidence *aliunde."* While this rule is pertinent to the California courts alone, and may be irrelevant beyond, there has been no occasion for its disregard in this case.

It is further contended that the report of the referee is like the verdict of a jury, and must be destitute of any evidence to warrant the court in setting it aside and making findings in opposition to those of the referee.

This doctrine is unwholesome; its tendency would sanction ingenious fraud, mistake, and accident, as elements of justice, if grounded on " any evidence," that of the parties themselves or their interested witnesses. Verdicts are not thus preserved in the *nisi prius* courts. The referee is obliged to be as mindful of the *weight* of evidence as juries are, and to be regardful of it within the discretion of the court which renders judgment according to the integrity, or error, apparent in the text of the referee's report.

In support of this view, it is laid down in Edwards on Referees, 149, that, " the rule that the report of a referee is not to be set aside, unless it is plainly against the weight of evidence, can apply only where the grounds of his decision are explicitly stated by him, or are apparent on the face of the report. Where several distinct and alternative questions, both of law and fact, have been submitted, and his report is general, the court can sustain the report only when it corresponds with its own view of the law and merits of the case."

That the report rests on the weight of evidence is here recognized as a rule, and in a frequent alternative—that of the case at bar—"the, court can sustain the report only when it corresponds with its own view of the law and the merits of the case." The court below is believed to have had sufficient authority for its action in the present alternative.

In *Scranton v. Baxter*, 4 Sanford, 6, on a motion to set aside the report of a sole referee, as contrary to law and the evidence, Duer, J., expressed the opinion of the court as follows: "It is frequently said that where a cause involving questions of fact has been submitted to a referee, his report is to be viewed in the same light as the verdict of a jury, and consequently ought not to be set aside unless it is plainly contrary to the weight of evidence; but we must be satisfied, upon a very slight consideration, that this rule can only be applied where the grounds of the decision are explicitly stated by the referee, or from the nature of the controversy are apparent upon the face of the report. Where a case is made in support of a motion for a new trial, the questions of law and fact are carefully separated. The questions submitted to the jury, and the directions to the jury by the judge, are distinctly stated, and hence, if in the judgment of the court error has intervened, it is referred without difficulty to its proper source. As the questions of fact upon which the jury must have passed are certainly known, it is easy to compare their verdict with the evidence upon which it was founded, and if there is no just exception to the charge of the judge, the rule that the verdict ought not to be disturbed unless contradicted by an overruling force of evidence, may be properly invoked to guide and control the decision of the court. But where a cause, involving several distinct and alternative questions, both of law and fact, has been submitted to a referee, and his report is general, the case is widely different. It is then impossible to say what has

been the actual decision of the referee upon any one of the questions which the parties raised before him. It is even impossible to say whether he has considered at all the only questions that the court, which is called upon to review his report, may deem to be material; and in this uncertainty the court must necessarily act in the free exercise of its own judgment, and can only sustain the report when the conclusions of the referee correspond entirely with its own views of the law and merits of the case." The report was set aside, the order of reference was vacated, and the issues sent to a jury, in conformity to this opinion. It is believed to be the consistent foundation of a rule.

The present case furnishes one of the many illustrations of the truth and cogency of the observations and the rule in the opinion cited. Of the several distinct and alternative questions of law and fact involving the legal status, the time, place, and circumstances of the marriage and cohabitation of the parties, as husband and wife, as shown in the appellant's post-nuptial correspondence, in his voluntary introductions as the husband, and his various acknowledgments of the marriage relation, the report of the referee is general or negative only, without such findings, upon the evidence, as to inform the court below whether or not the parties, or either of them, had contracted, assumed, and acknowledged the marriage relation in good faith, or whether their intercourse was wholly meretricious, and that of a mutual fornication and lewdness. These inquiries need not have escaped the referee; they were the very pith and motive of his investigation.

To follow on, after the citations of appellant's counsel, the next case, of *Mills v. Miller*, 3 Neb., 93, is that of a referee to account for rents and profits in the partition of real estate, in which there are found no analogies, of law or fact, applicable to this proceeding.

The case of *The State v. Bennett*, 19 Neb., 191, in which it was held that, "the findings of a referee, like the ver-

dict of a jury, will not be set aside unless they are clearly wrong," is now cheerfully re-affirmed, as well as the decision in *Brown v. O'Brien*, 4 Neb., 199, " that the report would not be set aside unless clearly against the weight of evidence." No departure is intended, in the review of this case, from the settled principles of the court; the " weight of evidence " will be duly attended to. On the question of the authority of the court to limit, set aside, or reverse the report of a referee, for sufficient cause, and upon the weight of evidence, our opinion is clear and unequivocal for the exercise of that power, if necessary to the ends of justice.

The cases cited by counsel in support of his argument, exalting the functions of the referee, and limiting the powers of the court, do not, in our opinion, justify the assumption of consubstantial authority in the referee.

In *Graham v. Kibble*, 9 Neb., 182, the court held merely that, " where issues of fact are tried without a jury the finding of the court is entitled to the same respect accorded to the verdict of a jury under the same circumstances," but this acknowledged rule comes far short of the proposition stated, for the findings of the court, jury, and referee may be set aside for cause, and the reviewing court render its judgment on the weight of evidence. *Brooks v. Dutcher*, 22 Neb., 688.

The case of *Tingley v. Dolby*, 13 Neb., 371, cited by counsel, is still more significant of the authority of the reviewing court to correct errors of a report, verdict, or judgment, under a reference, and the readiness with which either may be set aside for cause. It is thus stated : This case was committed to a referee, who heard all the testimony, and made his report, which was set aside by the district court, to which exception was taken. A trial was had to a jury, and a verdict for the defendant for a sum for which the plaintiff was not liable, and judgment rendered. On review, it was held that there was no sufficient

grounds for setting aside the report; that it could only be set aside for cause, and there appeared none. In the trial to the jury there were manifest errors. The judgment on the verdict was reversed for errors of law, with directions to confirm the referees' report upon the clear preponderance of the evidence, and enter judgment accordingly. The report was thus restored for cause, and judgment rendered on the weight of evidence, where the conclusions of the referee corresponded strictly to the views of the court on the law and the merits of the case.

In the additional cases of *Seymour v. Street*, 5 Neb., 89; *Cheney v. Eberhardt*, 8 Neb., 423; *Potvin v. Curran and Chase*, 13 Neb., 302, and *Hartley v. Dorr & Co.*, 15 Neb., 451, the restriction in favor of report, verdict, and judgment of the court below extends only to the sufficient cause and weight of evidence contended for.

In the further case of *Brown v. Hurst*, 3 Neb., 353, cited in support of the referee as the more competent and impartial umpire of the questions of fact, from having examined the witnesses, than the constitutional court which set aside the report, it was ruled in the case "that, in setting aside a verdict, it should appear to a reasonable certainty that injustice had been done to the complaining party by the failure to give the whole testimony its proper weight in determining the questions submitted." We believe that such a complaint, in this instance, has full grounds of support, and we trust to a justification of our opinion in the further examination of the evidence.

Without material error of the minor questions referred to in the court below, the whole issue further depends on the weight of evidence as to the marriage and the law of the case.

It appears that the plaintiff, who brings the action, was about thirty years of age at the time of the alleged marriage, August 2, 1881; that she was an intelligent and attractive young woman, of good character, and well edu-

cated as a teacher in the high schools of town and country, by which employment she alone gained her livelihood.

The defendant was some little older, of like reputation and condition in life, without invested capital, and dependent on his industry in trade, or commercial employments, to make his way. A mother and sister were in some degree dependent on him. There was no disparity of social rank or fortuitous circumstances between the parties. Their courtship, from about the period of their majority, was marked .by honorable sentiments and deportment so far as disclosed. She was a teacher at various places, and he a commercial salesman, seeking her society as frequently as circumstances would permit; first in Iowa, subsequently in Illinois, and next in this state, to which she had removed as a teacher at Plattsmouth, or other places.

It is in evidence that on August 2, 1881, the plaintiff had gone from Plattsmouth to Chicago, at defendant's request, in pursuance of a prior correspondence and understanding with him, and was there married to him privately, without witnesses, by an official who assumed to exercise the functions and perform the usual marriage ceremony, but of whose name, office, or locality she did not inquire, nor was she informed ; that the defendant assured her, at the time, that they were properly married and that it was all right, took her away from the Commercial Hotel, where she had stopped by his direction, to that of the Briggs House, where he introduced her as his wife, treated her in all respects as such, consummated the relationship, and remained together for two or three weeks as husband and wife.

The plaintiff's explanation of the marriage, as detailed, was that of an expediency, to keep the fact from the knowledge of the defendant's family and the public, on the assurance that as soon as he could arrange matters so that. his mother and sister would not have to live with him, then he and she should live together. In other words,.

that the marriage was not to be made public until he could provide a home for her. Her own family at DeWitt, Nebraska, she alone informed of the fact. From Chicago, at the end of two or three weeks, she returned into Iowa, and followed her vocation of teacher for a year, when she returned to her brother's residence (R. D. Anderson's) at DeWitt, Nebraska. The defendant having left Chicago at the same time, but separately, followed his business of traveling salesman; their correspondence by mail was continuous. In July, 1883, the defendant visited her first since the marriage, at her brother's in DeWitt, to consult as to settling in Nebraska, remaining three or four days, but was not introduced as her husband. In November following she visited him at his mother's in Atkinson, Neb., staying two or three days only, under her maiden name, and for several weeks at the house of Mr. Graham, the defendant contributing to her expenses, and accompanying her part of the way on her return home. On April 3, 1884, defendant sent a telegram, which is in evidence, from Omaha, addressed to Mrs. M. D. Gibson: " Meet me at the B. & M. depot in Lincoln. V. H. Gibson." Accordingly she met him at that depot, where she introduced him as her husband to Mr. R. R. Randall, the emigration agent of the Burlington and Missouri River Railroad Company, that they might have some business conversation in regard to their settling at Oxford, a new town situate on the line of the B. & M. road, on which subject there had previously been a correspondence.

The plaintiff testifies that, prior to this, their marriage had been acknowledged; that the defendant had urged her to make it public before, but she had waited until he had agreed to come to her, and go back with her to her brother's house to be introduced, received, and acknowledged as her husband, which he did. From Lincoln they went to DeWitt, where she introduced defendant, as her husband, to her friends and acquaintances, as well as at her home

27

in her brother's family.   He was there introduced, received, and entertained as her husband; they occupied the same room as husband and wife during his sojourn of three or four days; their conversation there was on their plan of locating their home and business at Oxford; defendant objected to taking her to Atkinson, because his mother and sister lived with him there, and he would not live in the same town with them; he told her to go to Oxford and look at the place with a view to removal there, which she subsequently did; that he would send her money as soon as possible, to buy a business lot there, and talked of undertaking the lumber business; that the understanding was when he left her at DeWitt, that he went away to return as soon as he could close up and settle his affairs at Atkinson; that their correspondence was continuous, without any serious altercation until November following, when, she testifies, he renounced her as his wife.

On the plaintiff's examination she identified a number of letters received by her addressed to Mrs. M. D. Gibson, by mail, in care of R. D. Anderson, DeWitt, Nebraska, as those written to her by the defendant from Atkinson, Nebraska, which were admitted in evidence, marked as exhibits alphabetically, and returned with the testimony: These letters have been examined by the court.   Her cross-examination disclosed no inconsistent explanations at variance with the testimony in chief.

· Robert D. Anderson, aged forty-seven, resident of De-Witt, testifies that he is a brother of the plaintiff, and that he first knew the defendant sixteen years ago; that defendant came to his house in DeWitt in April, 1884, as the husband of his sister; that he was entertained two days or longer, and then recognized the plaintiff as his wife, and lived with her as such during his stay there.   Witness had prior information that his sister was married to defendant, and received further proof of the fact by his being introduced into witness's family, to witness and to his wife,

and to their friends, as the husband of their sister, Mrs. Gibson. Witness has had correspondence in writing with the defendant, in which defendant acknowledges her as his wife, and produces the defendant's letter to that effect, marked exhibit "A" to this deposition.

Richard R. Randall, aged fifty-seven, resident of Lincoln, testifies that he is acquainted with the plaintiff, and with the defendant by her introduction of him, and by written correspondence with him; that in March, 1884, the plaintiff came to witness's office to inquire as to a location for business; witness recommended Oxford, in Furnas county, as a good location for the business she desired to start in—that of millinery and ladies' goods, and finally lumber and banking. On her subsequent return from Oxford she called on witness with another party, who she said was interested in the business, and she informed witness that she was a married woman, that Vincent H. Gibson was her husband, the same from whom witness had received a letter of inquiry about Oxford, dated March the 5th instant. Two letters received from the defendant, marked exhibits A and B, are produced in evidence. The witness also testified that on April 3, 1884, the plaintiff introduced to him, at the B. & M. depot in Lincoln, V. H. Gibson as her husband, for the purpose of an interview with witness as to a location at Oxford, Neb., and to whom witness gave, at that time, an order for a round trip land exploring ticket of the B. & M. company, for himself and wife, to Oxford and return. The defendant left witness fully impressed from the circumstances that the plaintiff was his wife. About two months before this introduction she acknowledged to witness that she was married to Mr. Gibson, and that they were going to establish themselves in business so soon as he could sunder his relationship at Atkinson, in business matters, and transfer them here. Of the social and marital relationship of the parties witness knew nothing personally, but what Mr. V.

H. Gibson himself said in this witness's presence to that effect.

The defendant's examination includes a copious category of negatives. He denies under oath all the material statements of the plaintiff not corroborated by his own writing or supported by other direct proof. His testimony is to the effect that he had known the plaintiff since the year 1868, first at his sister's house in Boone, Iowa, where he commenced paying her attentions, going with her sometimes to church, and sometimes to her school. He remained there twelve or fourteen years and she went out to DeWitt, Plattsmouth, and other places in Nebraska; never saw her in Nebraska prior to the alleged marriage in Chicago; had been in Chicago a week before she came to meet him, on a previous correspondence by letter. There was no marriage thought of in Chicago, nor anywhere else was there ever any courtship or marriage thought of until after her visit to Atkinson in November, 1883, and that was for the purpose of deceiving her folks. They met at Chicago to have a little social time together, and had it. There was a fair understanding, which had been practiced before, at least five or six years before she left Iowa, and it was the same that she met defendant for when they staid together in the same bed, in the same room, in the same hotel in Marshalltown, Iowa, at least two or three years before the event at Chicago. She then went one hundred miles out of her way to meet defendant at Marshalltown. As to the occurrences at Lincoln in 1884, defendant explains that while she was at Atkinson, in the fall of 1883, she claimed to be in a family way, and proposed to produce miscarriage, which defendant persuaded her not to undertake, advising her if she got into any scrape to go through with it, as he did not want to be a party to abortion. She then said that if she could make it all right with her folks, and make them believe she was married that would satisfy her. She then returned from

Atkinson to DeWitt; the correspondence was continued. She claimed to be getting towards childbirth; that her folks ought to know or be induced to believe that there was a marriage in order that she should not be left in trouble and disgrace, and said that if defendant would only come down there and stay with her a few days she would never ask anything else of him. This arrangement was made partly before she left Atkinson and partly by a correspondence, which, except one or two letters, was destroyed before any suit was commenced. She promised to remain right at home, not to come away at all, nor let anybody know of it except her people. When defendant was about to start, or was on the way, he got word from her by letter that she would be in Lincoln, that her people said it wouldn't look well; that she must go and meet him and come back with him. As to the time and place of the marriage she was to fix that to suit herself and defendant would endorse it, and has letters to show it. He never told or admitted that they were married. They went from Lincoln to DeWitt, and from that depot to her brother's house, and met the folks as he had met them before. They congratulated him on being married, and he stopped there just about a day and a half, carrying out his agreement as to *playing* married, with the understanding that that was to be the end of it so far as both were concerned. If she needed help he was willing to help her some. When she came to Atkinson it was at defendant's suggestion to take up vacant land. She entered one claim and sold it for $200 when it was worth a good deal more. Defendant was acting then as her friend and agent, and renewed his acquaintance when she came up; "she knew the laws in regard to taking land just as well as anybody, and she knows the laws in regard to marriage in Illinois; she is a well educated lady and an intelligent lady, as everybody can see."

The defendant testified that in Chicago there was no

talk of marriage; that the first he knew that she was going to claim that he was married to her, was when the draft he sent her, for the price of the land claim, came back endorsed Mattie D. *Gibson*; that he never addressed her a telegram as Mrs. M. D. Gibson, and that the one introduced as evidence is a forgery. At Marshalltown, and at Chicago they were registered at hotels in some fictitious names, not now remembered, without any introduction of her at all, at either place.

On cross-examination he was unable to tell what year it was, exactly, they met at Marshalltown, but it was after she had removed to Nebraska, as he wrote her letters, and sent her money there to come on.

Q.    When did you first see her after she left Iowa?

A.    Several years, from two to three years.

Q.    Where after she came from Nebraska?

A.    At Marshalltown, Iowa.

Q.    Where the second time?

A.    I might have seen her once in Nebraska before she she came to Chicago.

Q.    During the summer of 1880 were you not in Kansas, and did you not write to her that you had a suit in Iowa, and went from where you was straight to where she was?

A.    I went to Kansas, that is a fact, and on the road to Kansas went to her place, and came back that way; I think I was there twice; I don't know whether it was before I saw her in Chicago or not.

Q.    Do you know what year you met her in Chicago?

A.    I could not tell without referring to dates.

Q.    Was it in the year 1882?

A.    I don't know whether it was or not?

Q.    Was it in 1881?

A.    It may have been.

Q.    Might it not have been in 1880?

A.    It might.

Q. In 1879?

A. Possibly, it might.

Q. When was the next time you met her?

A. The next time I met her after being in Chicago, was at DeWitt, before I located at Atkinson, in June, 1883.

Q. When next?

A. Not till she came to Atkinson in the fall of 1883.

Q. Where next?

A. When I went to her house and she told the folks that we were married, in the spring of 1884.

Q. How long after you went to Niobrara to file a contest on a piece of land, March 31, 1884, was it that you went down there?

A. I went right straight through from Niobrara.

Q. Did you at that time send a telegram from Omaha to Robert D. Anderson, asking "where Mattie was?"

A. I may have done so.

Q. And after that did you not telegraph her?

A. No sir, I did not; never sent her any telegram at all.

The testimony of the additional witness for defendant, Sarah A. Gibson, is to be characterized as irrelevant and immaterial to any question at issue; that of the remaining witness, John Robinson, as to the plaintiff's criminal act of staying over night in a room with the defendant at the Bowler House, in Marshalltown, Iowa, without any recollection or knowledge as to the month or year of the occurrence, and without any previous or subsequent knowledge of the plaintiff, is testimony so indefinite, and of a character so nearly allied to perjury, as to merit neither consideration nor remark.

The plaintiff's action in the court below depended on her testimony as to her private marriage at Chicago, Illinois, without witnesses to the ceremony, and on the subsequent acknowledgment of it, in various ways, by the defendant, as direct or circumstantial evidence of the fact.

That such marriages have occurred in good faith, and have been resorted to from various motives of expediency is neither incredible nor uncommon. The apparent motive, in this case, for the *semble* of unmarried relations, before the public, was the inability of the defendant, at the time, to provide a home for the plaintiff separate from that of his mother and sister.

The defendant, after three years, repudiated the marriage, and denied in the court below all the consistent acts of courtship leading up to it; and made his defense to the action, and his explanation of the culpatory circumstances of sexual intercourse as husband and wife, on the sole ground of the mutual fornication of both parties, which had been practiced habitually, as the only tie of their association and correspondence.

There was no evidence to corroborate this theory. There was no other evidence to impeach her character, but all the material circumstances of their controversy commend her good character.

The examination of the defendant, when not answered in negatives, was indirect, evasive, and inconsistent, and the implications from his conduct and correspondence are such as to discredit it. His letters, in evidence, addressed to the plaintiff as Mrs. M. D. Gibson, are consistent with the relationship of husband and wife, and not otherwise. These are ten in number, mailed and delivered to the care of the witness, R. D. Anderson, the plaintiff's brother, at whose house she made her home in DeWitt; thus publishing the fact, circumstantially, that she was married and was his wife.

The defendant's letter, made exhibit E, was received October 1, 1883, as follows:

" *Mattie D.*—I would like to know what in the old Harry is the matter, or the reason you don't come up here. Great Moses! I have been watching the train for a month, and no sign of you yet. I want you to get here now at

once, without fail. Can you understand that? Why
don't you write and tell me what the trouble is? I have
written often enough for an answer, and if you don't
answer this I shall ———.

"Come just as soon as you get this. Good-by.

"V. H."

In compliance with this request the plaintiff went from
DeWitt to Atkinson, Neb., in November following, first
stopping at the defendant's house, with his mother and
sister, for a few days, but her sojourn there being mutually
disagreeable, she removed to another boarding house for
several weeks. She testified that she then believed herself
to be with child, and represented her condition to the de-
fendant; that they agreed to publish their marriage for
that reason, and further to prospect for a future residence
and business in the new town of Oxford, in Furnas county,
on the line of the B. & M. railroad in Nebraska. At
this time, on the advice of the defendant, she signed a
blank application for claim to public land, and returned
to her home in DeWitt.

The defendant's letter, exhibit B, was received in Feb-
ruary, 1884, as follows:

"*Mattie D.*—Thanks for your good letter just received.
I write you to-night that you may get it soon as possible.
Regret that I cannot go to Oxford. I shall try to send
some money to you, so you can go and buy a lot for your-
self. I came near selling the corner here that had the
little building on it; may complete the trade yet.

"I regret that we are situated as we are, but no one is to
blame but you and me, and it is not any one's business,
but ours, if you are with child. I am sorry for you, be-
cause you are the one that is sold. I am not worthy the
love of a good girl, and don't expect it for any length of
time. I know myself better than you know me, and can
not blame you for any kind of a letter you write. Mattie
D., you could very easily write differently. I can appre-

ciate your situation if it be true as you claim. But you cannot have much regard for me and I don't blame you. Tie two chickens together with a string around the neck and watch the effect. It will remind you of the situation of some other two-legged chickens. This baby claim of yours is the string between us. Well, I shall send the papers in the morning with this. You can double it up and return in the enclosed envelope. I don't like to sell the claim for you at $200, but as you are situated, guess it is best. I shall get the tree claim for you if possible. I can get cash by discounting the notes, but it will probably be better to take a little less in cash. Good-by. V. H."

It appeared as an axiom in morals, to the defendant, on the right hand, that it was nobody's business, but theirs, if his *wife* was with child; but, on the left hand, it would appear to have been everybody's business if the child was the fruit of fornication and bastardy, instead of wedlock. This statement is therefore a necessary implication of marriage. The letter tends to confirm their marriage relations, as well as the existing inconvenience to defendant of assuming the obligations publicly.

The defendant's letter, exhibit C, was received the first of March, 1884, as follows:

"*Mattie D.*—You are a "boss girl." I don't want you to do any hard work, and had rather you would go home and rest. I have not changed any in my ideas of you, only for the better, and with every letter from you there comes a greater appreciation of them, and of you. I would be very glad to see you to-night; and when you wish me to come, write me, and I shall go; that is all there is to that.

"I don't want you to do anything only what you want to, and don't get the blues. I have got over mine, and am as happy as usual. Don't fret or worry. You can tell your people whenever you think best. It is useless to be foolish about anything, and especially something that we may be, and ought to be, proud of.

"I shall write Mr. Randall to-night about that *new* town. I wish I was loose from this place. Is there U. S. land near that place? I do not care for the land we have taken here particularly, but the town property is pretty good, and I will keep it for awhile anyhow. I must go to Niobrara on the 10th to contest that claim. I think I can sell it, and yours also, before long. I would like to locate somewhere that I can stay and be free of all old deals and parties here. But I don't know that the happy day will ever get around. I have fifteen horses that Sprague left with me to sell. He staid two weeks and the weather was so bad he could not sell any, so went home. I have sold two and think the rest will go soon.

"Well, to refer to that eventful day; it will be sometime in August, I believe, won't it? I shall send this to *R. D.*, as before.

"Now must write to Mr. Randall.

"Yours,

"V. H."

This letter is confirmatory of the former, and corroborates the inferences and observations from it. The defendant advises the plaintiff to tell her people whenever she thinks best their true relations, the subject of their correspondence and their chief concern, acknowledging the uselessness of longer concealing that which they ought to be proud of. The letter to Mr. Randall is as follows:

"ATKINSON, HOLT CO., NEB., Mar. 5, 1884.
"*R. R. Randall, Esqr.:*

"DEAR SIR—A letter just received from DeWitt, Neb., refers me to you for further information in regard to Oxford. Will you please send map of your line of road showing the location of town; also tell me what its prospects are? How large the town is, and prospects of business, and greatly oblige.

"Yours, &c.,

"V. H. GIBSON."

The second letter to Mr. Randall is as follows:

"ATKINSON, HOLT CO., NEB., Mar. 13, 1884.

"*R. R. Randall, Esq.:*

"DEAR SIR—Your letter and papers received; thanks for the same.    Before closing all interests in this place I would like to visit Oxford, and if consistent with the rules of your company would like to have a pass from Omaha and return.

"Respectfully, &c.,

"V. H. GIBSON."

If credit could be given to the defendant's theory of defense, the letters cited would disclose an ingenuity of tergiversation and hypocrisy wholly superfluous.    If his relations were meretricious, and not founded on marriage, the business feature of his correspondence is unaccountable. Men are not given to express anxiety and concern, and make provision for a spurious claimant to so weighty an obligation as that of marriage.    Its inconsistency is not reconciled to his testimony.

Subsequent to these letters the defendant, on returning from Niobrara, March 31st, inquired by telegram from Omaha of the plaintiff's brother, at DeWitt, where Mattie then was; and being informed, addressed her by telegram, dated Omaha, April 3d, as "Mrs. M. D. Gibson: Meet me at the B. & M. depot in Lincoln," which dispatch was delivered, received, and is produced; and they met accordingly. The defendant testifies that this dispatch is a forgery, and that he never addressed her in that manner, but it has every other evidence of authenticity, besides the testimony of the plaintiff.    What motive there was for this denial, or what advantage in disclaiming it, is not apparent, for he had already addressed letters to her, by mail, in the care of R. D. Anderson, as "Mrs. M. D. Gibson."    The dispatch was but a repetition of the practice of addressing her which had then become, and continued to be, the rule of his correspondence.    At this appointment he was intro-

duced to the witness, Randall, as the husband of the plaintiff, and gave every sign and token to the witness that he bore that genuine relationship. It was carried into serious business affairs so far as to leave no suspicion of doubt of the fact. He maintained that relationship in the manner of his introduction, in the inference of prior correspondence, in the substance of the interview, and in his request, which was granted as the husband of the plaintiff. To this personation of the relationship at Lincoln he immediately added the confirmation of his words and acts to the kindred and in the household of the plaintiff at DeWitt.

The testimony of the witness Anderson, to the character of the family transaction, is explicit and undoubted. That of the defendant, himself, admits that he accompanied her home as her husband, and there "*played married,*" which, if true, was in itself an offense punishable by fine and imprisonment under section 209 of the criminal code of this state.

The apparent weight of evidence discloses the relationship of the parties from August, 1881, to November, 1884, to have been that of mutual contract as husband and wife, entered into in due form in Chicago, Illinois, and accepted by both parties in good faith. That there is no proof of record under the *lex loci* is not deemed to invalidate their contract. It was not within the statute of void and illegal marriages of that state. The statute of this state provides that, "in law, marriage is a civil contract to which the consent of parties capable of contracting is essential" (Comp Stat., Ch. 52, Sec. 1), and that, "all marriages contracted without this state, which would be valid by the law of the country in which the same were contracted, shall be valid in all courts and places in this state." (Id., Sec. 17.) If, therefore, the contract and marriage of the parties in Chicago were not repugnant to the laws of the state of Illinois, the same may be accepted as "valid in all courts and places in this state." It is not believed that a private

marriage of the manner and form of that in evidence is invalid in Illinois, for the reason that the marriage act is a directory statute, and does not abolish the common law rule of evidence as to marriages, in civil causes, which has been the rule of that state since 1854; that in proceedings for *divorce* and the like it is not necessary to prove there that the parties were lawfully married, the confession by the respondent of the fact being competent, and that in all civil actions reputation, cohabitation, or the acknowledgment of the parties are sufficient evidence of marriage there. *Harman v. H.*, 16 Ills., 85. This rule was affirmed in 1875, in the case of *Miller v. White*, 80 Ills., 580, in which it was held that proof of actual marriage is required in cases of bigamy and criminal conversation only. In all other cases the presumption of marriage obtains from evidence of cohabitation, name, reputation, and other relative circumstances.

In 1878 this rule was carried to its most effective extent in the case of Mrs. Sylva Coster's action against Douglas Lowry, at Aurora, Ills., for loss of support from the sale of spirits by defendant to her husband, in which she recovered $1,000 damages. On the trial to the jury her marriage was proven on her own oath, without other evidence. Exceptions were taken to the supreme court, and the chief justice said that, "while it is insisted that record proof of the marriage was required, and the court erred in permitting the plaintiff to testify to the marriage, we do not understand that record evidence of the marriage is required in a civil action." 2 Greenleaf, Sec. 461, lays down the rule that, "upon the trial of indictments for polygamy and adultery, and in actions for criminal conversation, direct evidence of marriage is required, but in all other cases any other satisfactory evidence is sufficient." In section 462 it is further said that, "marriage may also be proved in civil cases by reputation, declarations, and conduct of the parties and other circumstances usually accompanying that relation,"

and this is the rule of law in this state. That degree of evidence, therefore, valid and customary under the law of Illinois to prove the marriage there, where it was contracted, may from that example be accepted in all courts and places in this state. But this authority is not confined to the jurisprudence of Illinois. The supreme court of the state of Maine, in 1849, in the civil action for slander of *Taylor v. Robinson*, 29 Me., 323, held, " that in all civil personal actions, except for criminal conversation, general reputation and cohabitation are sufficient evidence of marriage (2 Starkey Ev., 932), and that the proof of marriage, as of other issues, is either by direct evidence of the fact, or by evidence of collateral facts and circumstances from which its existence may be inferred (2 Greenleaf Ev., 461); that it is competent to show their conversation, addressing each other as man and wife; their cohabitation is taken to be lawful till the contrary appears. The evidence of marriage is such as has been allowed in all civil cases, and we find no authority for a legal distinction in cases where the party to the marriage is a party to the suit, and offers to prove the marriage, and when the proof of it is by a third party or a stranger."

In *Hurley's Case*, 14 Gray, 411, in the supreme court of Massachusetts, in 1860, it was held that, " cohabitation and the conduct of the parties are in all cases competent evidence in proof of marriage."

In *Redgrave's Case*, 38 Md., 93, it is stated that, " where parties live together, ostensibly as man and wife, demeaning themselves towards each other as such, and are treated by their friends and relations as being entitled to that status, the law will, in favor of morality and decency, presume they have been legally married."

In *Bowers v. Van Winkle*, 41 Ind., 432, the court held that the objection that the marriage of the appellee could only be proved by the record was untenable and not now maintained. It is the general rule that, in civil suits, ex-

cept for criminal conversation, cohabitation and reputation are sufficient evidence. *Fleming's Case,* 8 Blackford, 234. *Trimble's Case,* 2 Ind., 76.

In Iowa the rule of presumptive marriage after cohabitation has gone to the protection of separated parties, and the implication of divorce, to maintain innocence; as where a husband and wife separate, and the former lives and cohabits for years with a woman who is reputed to be his wife, the law presumes a divorce from the first wife, who may legally marry again. " If the marriage was originally void, subsequent marriage will be presumed to have occurred, if the parties continue together after the removal of the legal impediment." And it was held that, "any mutual agreement between the parties to be husband and wife *in presenti,* followed by cohabitation, constituted a valid and binding marriage, if the parties are under no legal disability." *Blanchard v. Lambert,* 43 Iowa, 228. The rule of evidence has been extended in Iowa. In the prosecution of Mary Wilson for adultery with Thomas Hawthorne, October 30, 1865, the prosecuting witness, Hannah Hawthorne, testified that she was married to Thomas in 1846, in Canada, by a Baptist preacher, and had lived with him continuously and borne him eight children. The defendant objected that the proof of marriage was insufficient; that it was necessary to prove that the marriage was solemnized by an authorized person under the laws of Canada, which was overruled, and the jury instructed, " that the testimony of either the husband or wife as to the fact of marriage, with proof of continued cohabitation, raises such a presumption of an actual legal fact as requires the defense to rebut it." Dillon, J., said that, "record evidence of marriage was not indispensable, and that the law given by the court was the correct rule. We are aware of the state of authorities on this question, but do not deem it necessary to enter upon the discussion. We have ruled similarly in relation to bigamy, where the

stringency should be equal to that in adultery," in *The State v. Williams*, 20 Iowa, 98.

Section 4, chapter 25, of the act of Divorce and Alimony, provides that, "when the validity of any marriage shall be denied or doubted by either of the parties, the other may file a petition (as in cases for divorce) for affirming the marriage, and upon due proof of the validity thereof, it shall be declared valid by a decree or sentence of the court, and such decree, unless reversed on appeal, shall be conclusive upon all parties concerned."

Though this statute, under which this action is brought, has been in force for a considerable period, and like statutes are in force in other states, no strictly analogous precedent has been found reported. Decrees of nullity in cases of voidable marriages in Massachusetts, Maryland, Vermont, and Kentucky have been examined and found irrelevant to the question at issue.

The main question recurs upon "due proof of the validity of the marriage." It is testified by the appellee that it was entered upon with due ceremony and form, and concluded by cohabitation as husband and wife, which was recognized and admitted by the appellant from August 2, 1881, to November 2, 1884. Her competency as a witness, in this form of action, has been carefully considered. In all complaints against the husband for desertion the wife has generally been admitted as a witness to prove the fact, and that of the marriage. The condition, if any, has been that her testimony would be considered as a chancellor considers all testimony, if relevant and credible to give it that weight to which it was entitled, and no more.

To the once general rule that husband and wife are incompetent to testify against each other, or to prove their marriage, has succeeded a more liberal, if not a contrary rule, one allowed from the necessities, partly for the protection of the wife in her life and liberty, and partly for

28

the sake of public justice. 1 Greenleaf, 343. From the nature of this case, the testimony of the wife as to the contract of marriage has been accepted and considered. The exclusion of her testimony, on the former ground of identity of legal rights and interests essential to the social happiness and confidence of the parties, would be an enforcement of the former rule in the absence of the reasons for it. The marital happiness and confidence of the parties are not *in esse*. If the statute is *pari materia* with that of *divorce*, there would seem to be equal reason for accepting the testimony of the wife as in divorce cases.

It is regarded as settled by judicial authority throughout the United States that marriage, in its legal sense, is a civil contract; that it is not indispensable that a clergyman or magistrate should be present to authorize and confirm the contract in order to give validity to the marriage. Therefore if this was made, as appears, by contract, either in Iowa or Nebraska, followed by celebration and cohabitation in Illinois, it amounts to a valid marriage, and is not voidable at the will of either party, but is as binding as if made in the presence of chosen witnesses at the Christian Altar. The testimony of the appellee is neither improbable nor inconsistent. It is corroborated by the appellant as to time and place of cohabitation following the marriage; by his conduct and correspondence with the appellee; by his direct acknowledgment of the relationship; and by letters addressed to the witnesses who testified to the fact, and by voluntarily assuming the relationship of husband before the appellee's family and before the public. It is further manifested in his letters in evidence, the words and sense of which no exculpatory explanation of the writer is now competent to efface.

On the other hand, the theory of illicit intercourse as a defense, and the testimony of the appellant, seem improbable. Neither is corroborated by credible testimony, nor by circumstances concurrent to either pretension. The

.theory subjects the moral character of the appellant to cen-sure, and his testimony impeaches the credibility of his written admissions.

From the weight of evidence and the authorities cited, it is our opinion that the court below had ample jurisdiction of the referee's report, with the errors and exceptions therein, and had ample authority to set aside the findings of the referee, and adjudge the whole issue according to the weight of evidence presented.

The judgment is therefore affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.