VALERIA W. COAD, APPELLANT, V. MARK M. COAD, AP-
PELLEE.

FILED JUNE 29, 1910.    No. 16,081.

1. **Marriage: CIVIL CONTRACT: RULES APPLICABLE.** The contract of
marriage being a civil contract, the rules to be applied thereto
must be, to a great extent, the same as are applied to other con-
tracts.

2. ———: **ESTOPPEL.** If one party to such relation induces the other
to believe, in good faith, that the contract is made and is binding,
the law will hold the party taking such advantage to the full
terms of the agreement as in other cases.

3. ———: ———. Subject to the terms of the contract, the acts and
conduct of the parties, if one party to the agreement is known
by the other to rely, in good faith, upon the validity and binding
force of such contract of marriage, the other party will be bound
by it.

4. ———: **COMMON LAW MARRIAGE.** Proof of a common law marriage,
if sufficient to establish the relation, will sustain an action for
divorce and alimony to the same extent as though the mar-
riage were solemnized in strict accordance with law and usage.

5. ———: **EVIDENCE.** While the mere fact of the repeated indulgence
in sexual intercourse is not of itself conclusive proof of the
marriage relation, yet such fact is always a proper subject for
consideration in connection with and after evidence of the agree-
ment to enter, *in præsenti*, into the matrimonial state.

6. ———: **PRESUMPTION.** When there is evidence of an agreement of
marriage, valid at common law, and the proof of continued sex-
ual intercourse is unquestioned, the law will presume the acts
of the parties to have been lawful and in accordance with the
well-recognized rules of good morals and social duty, rather than
that they were criminal and in violation of good morals and
social obligations, as the law does not presume that people inten-
tionally do wrong.

7. ———: **EVIDENCE.** Where the evidence as to the fact of the entry
into the relation of husband and wife by present agreement is
conflicting, the subsequent conduct and actions of the party
sought to be charged may be considered as circumstances tend-
ing to throw light upon the question of the truth of the allega-
tion that such contract was made.

8. ———: ———. The evidence, referred to at some length in the

opinion, is examined, and it is *held* that the actions and conduct of defendant in connection with his letters, written to plaintiff, tend more strongly to establish the status of husband and wife than that of the criminal relation of libertine and mistress.

9. ———: ———. The letters and correspondence between the parties subsequent to the alleged entry into the marriage relation ِو not contain, in direct terms, any reference to the contract or relation, nor did either party, in terms, hold out or represent to the community at large that such relation existed. It was testified to by plaintiff, and denied by defendant, that their conduct in that behalf was by mutual agreement and at the request of defendant, based upon reasons which were satisfactory to plaintiff and to which she assented. This, if true, would sufficiently explain the conduct of the parties in that respect. The conduct of the parties tended strongly to support the contention of plaintiff.

10. ———: ———. Under all the evidence it is *held* that the marriage relation exists between the parties, and that plaintiff is entitled to a divorce and reasonable alimony.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Reversed and decree entered.*

*Price & Abbott* and *George L. Loomis,* for appellant.

*Isaac E. Congdon, W. J. Coad* and *Hall, Woods & Pound, contra.*

REESE, C. J.

This is an action for divorce and alimony. It is alleged in the amended petition that on the 1st day of January, 1905, plaintiff and defendant "entered into a contract of marriage, whereby plaintiff and defendant entered into the relation of husband and wife," neither being under any disability, and that that relation has existed between them from that date hitherto. Such facts are stated in the petition as, if sustained by the evidence, would constitute a common law marriage and entitle plaintiff to a divorce. It is averred that defendant is the owner of property in this state of the value of $800,000, and that

plaintiff is without means. The averments of the petition need not be stated with any greater particularity. The answer of defendant is a general denial. A trial was had in the district court involving the examination of a great number of witnesses, the evidence being presented here in a bill of exceptions of over 600 pages. The trial resulted in a finding and decree in favor of defendant, and plaintiff appeals.

The real, and practically the sole, issue upon which the determination of the cause depends is as to whether or not there was such an agreement and contract between the parties, followed by cohabitation, etc., as to create what is termed a common law marriage. If that relation existed at any time, it has not been dissolved, and, under the evidence as to the subsequent conduct of defendant, plaintiff would be entitled to a decree in her favor. If, however, that relation did not in law exist, the decree against her will have to be affirmed.

The law governing common law marriages is pretty well settled in this state by our former decisions and will not be herein discussed with the view of throwing any new or further light upon the subject. We need only refer to the following among other cases: *Gibson v. Gibson*, 24 Neb. 394; *Olson v. Peterson*, 33 Neb. 358; *Bailey v. State*, 36 Neb. 808; *University of Michigan v. McGuckin*, 62 Neb. 489, 64 Neb. 300; *Eaton v. Eaton*, 66 Neb. 676, annotated in 1 Am. & Eng. Ann. Cas., 199; *Sorensen v. Sorensen*, 68 Neb. 483, 490, 500, 509. Marriage being a civil contract, the rules to be applied must be, to a great extent, the same as are applied to ordinary contracts. Hence, if one party to such relation induces the other to believe in good faith that the contract is made and binding, the law will hold the party taking such advantage to the full terms of the agreement, as in other cases. So, if one party to the agreement is known by the other to rely upon the contract in good faith and that it is binding, the other party will be bound by it. This, of course, must depend upon

what is said and done, the same as in other cases.  Proof of a common law marriage is sufficient to sustain an action for divorce and alimony.  A common law marriage, while criminal under our statutes, is just as valid a marriage as if solemnized under all the forms of law, usage and custom, and is followed by exactly the same results.  While the mere fact of the indulgence in the sexual intercourse and relation is not of itself conclusive proof of the marriage, yet it is always a proper subject for consideration after evidence of the agreement to enter into the matrimonial relation.  Again, where such presumption may arise, the law will always presume that the acts of persons are lawful and that the commission of crime was not intended.  If, under the circumstances shown, a person may have acted from motives of morality and purity, the presumption in favor of such motives will prevail, as the presumption is that people do not intentionally do wrong.  These propositions are so well established that no citations are deemed necessary.

The evidence in this case established beyond dispute or conflict that after the first day of January, 1905, defendant very frequently went to the house of plaintiff, who resided with her widowed mother, in Omaha, and that no kind of formality in his visits was observed, and, when there, his actions and conduct were as free and informal and homelike as that of any husband; that plaintiff and her mother were in straitened financial circumstances, and that finally he caused their removal to Lincoln where they were placed in his own house, and the relations between them continued as before; that during the whole time he furnished money to aid in the expenses of the household; that neither party ever held the other out to the public, or even to their most intimate acquaintances and friends, as wife or husband, nor did they in their voluminous correspondence ever refer to each other in that light, yet the general terms used were often endearing and affectionate.  Upon these two propositions it is testified by defendant that their relations were at

all times meretricious and that they had existed long be-
fore the date named. This is denied upon the part of the
plaintiff, and she insisted on the witness-stand that their
relations were never criminal, and did not exist at all
until after the date referred to. She also testified that
the alleged marriage was kept secret at the special in-
stance and request of defendant, for reasons which were
assigned by him and which were by her deemed reasonable,
but particularly because it was in accordance with his
request and to which, for that reason, and having faith
in him and his assurances, she agreed. The bill of excep-
tions contains about 20 letters from defendant to plain-
tiff written during the year 1904, the last date being
in the latter part of December of that year and just prior
to the time when the plaintiff and her mother testified
that the contract of marriage was entered into. There
are five letters written in the fall and winter of 1903. It
is to be remembered that at the time of the commence-
ment of this correspondence plaintiff was the lawful wife
of a Mr. Hoover, but they failed to agree, were separated,
and an action by plaintiff for divorce was then pending.
The decree of final divorce was entered March 6, 1904,
and was doubtless aided in a financial way by defendant.

The letters written in 1904 abound in expressions of
friendship and affection, but cannot be here set out at
length. A few selections may be made from the closing
portions of some of them. In the letter of January 13,
1904, to "My Dear Val," he closes with, "Good bye my
dear girl, be good to yourself till I see you again. From
your cousin M. M. C." February 9: "My Dear Val * * *
I wish you would write me as soon as you can. Give my
regards to the folks. Hoping to hear from you soon, I am,
your devoted friend." March 6: "My Dear Val * * *
May sweet memories around your heart entwine leaving
a place for a friend of Old Lang Sine (Auld Lang Syne)."
March 19: "My Dear Val * * * I am your loving
friend." April 12: "My Dear Val * * * I will bid
you good bye and hoping to see you at the earliest op-

Coad v. Coad.

portunity I am as ever your dear old friend and sweet-heart." April 30: "My Dear ·Valeria  *  *  *  I want to see you very bad. I hope your dear old father is getting better and·that he may be able to get well. Give my regards to the folks and with best love to yourself, I am, sincerely yours." May 10: "My Dear Val * * * Good-bye Darling. Be good to yourself my dear. Hoping to hear and see you soon, I am, sincerely yours." May 23: "My Dear Val  *  *  *  In hopes to get that long letter very soon telling me about everything and that you have got almost well. I close for the present with many kind wishes. I am, your sincere friend and lover." July 7: "My Dear Val  *  *  *  I hope this will find you in better health and spirits and that you are improving in every way. I will inclose you a check in this letter of 50. I hope it will help to relieve you in your distress. Hoping (to) have the pleasure of seeing you soon, I am, your sincere friend and sweetheart." This must be sufficient to show the trend of defendant's letters prior to the date of the alleged contract of marriage. It may be said—is said, in effect, by defendant—that these are the letters of a libertine to his mistress. We have read them, as well as many others written prior to January 1, 1905, and have been unable to find a single word which necessarily implies an impure thought or reference. We cannot believe they were so intended, nor that any part of them can be rightfuly so construed.

The history of the case shows that plaintiff's father and mother were Germans, and, as many do, they kept intoxicating liquors in their home; that during the early days of this state they kept a hotel in Sidney, and, in connection with it, a saloon. At that time plaintiff was a little child. Defendant had a ranch near Sidney, and patronized the hotel and thus became acquainted with the family. Plaintiff's father finally closed out his business, removed to Denver for a time, and then to Omaha, where again they met and the acquaintance was renewed. Plaintiff was then the wife of Hoover, but a separation had

taken place. Her father was in poor health—probably drinking heavily—and the family were not living in affluence. Plaintiff's father became bedridden, and, after lingering a long time, died. Plaintiff's health had failed her and her prospects of long life were not promising. With the aid of $100 furnished by defendant she went to Denver for treatment, going to the home of an aunt, and while there defendant visited her. From his testimony it is very apparent that plaintiff was in a precarious condition, her prospects of recovery being very remote. Soon thereafter the death of plaintiff's father occurred, which required her immediate return to Omaha for the purpose of attending the funeral. She appears not to have returned to Denver.

Plaintiff testified that prior to the 1st day of January, 1905, defendant upon several occasions proposed marriage, but that she did not agree thereto, owing to the condition of her health and her financial embarrassments, not as an absolute refusal, but deferring the consideration of the subject until conditions and prospects became more favorable. This he as positively denies. She and her mother both testify that he came to their house on the 1st day of January, 1905, and proposed immediate marriage. Plaintiff testified that the proposition was first made to her in the absence of her mother who was in the kitchen preparing the evening meal; that she was urged to agree to it, and that the contract should be made between them without the intervention of a clergyman or other officer authorized to solemnize marriages; that to this she at first objected, but, upon his assurance that such a marriage would be valid, she consented, and they together went into the room where plaintiff's mother was, when defendant repeated to both his statement, and that they were thereby married; that plaintiff's mother objected to the proceeding, but upon the assurance of defendant that such an agreement was valid, and the declaration of plaintiff that such an arrangement was satisfactory to her, her mother yielded, saying they were both

Coad v. Coad.

old enough to know their own business and she would no
longer object; that the contract was thereupon ratified
by them, and by a kiss administered to each by defendant
the matter was considered settled; that defendant re-
mained there that night occupying a room and bed with
plaintiff; that he was absent a portion of the next day,
telling them before leaving where he was going and that
he would return later in the day; that he did return and
remained during the night as before, and from that time
on his visits were of the same character, his conduct be-
ing as a member of the family, contributing to its neces-
sities, and occupying the room and bed with plaintiff as
her husband. The testimony of plaintiff's mother coin-
cides with that of plaintiff as to all that occurred after
the entry into the kitchen by plaintiff and defendant.
Another witness, disinterested, testified to seeing defend-
ant at the rooms of plaintiff and her mother on that day.
The whole of this testimony is met by defendant with a
sweeping and positive denial. He denies being present
at the house of plaintiff on, or at any time near, the date
named, and offers quite persuasive evidence in support
of his denial. It is shown that about the 29th day of
November previous he met with an accident on his ranch
near Fremont by the falling of a horse upon which he
was riding, resulting in the fracture of his clavicle
bone, and by which he was confined to his room until the
latter part of December, if not to a later date. It is
shown, however, that he was sufficiently recovered to
leave home for the state of Wyoming about the 8th of
January. A number of checks, letters and telegrams,
bearing date at Fremont, January 1 and 2, were intro-
duced in evidence under the testimony of defendant that
they were issued on the dates and at the place printed
therein. Witnesses were also called who testified that
from the time he received the injury until his departure
for Wyoming he did not leave the ranch, except on one
or two occasions when he was absent but a short time,
going to Fremont to consult his surgeon, one of which

witnesses claimed to have been his housekeeper and acting as his nurse. However, a niece of defendant, who has been of his household continually for many years, whose testimony was taken by deposition and which bears upon its face the indelible stamp of candor and truth, was not interrogated upon that topic at all, and she was in a position to know as much, or possibly more, upon the subject than any other, her testimony being limited to the fact of defendant's injury in November, 1904, that the nurse above referred to took care of him, and that he left for his ranch in Wyoming "some time in January, 1905." The testimony of the alleged nurse does not impress us as being in all things absolutely candid and truthful. It was given by deposition. She stated that at the time he left for the Wyoming ranch "he was all right, only his shoulder bothered him a little," but that he could use it for ordinary purposes. Did this case depend entirely and solely upon the oral evidence of plaintiff, her mother, and the other witness, referred to as having seen him at their home in Omaha on the date named, we might, under the evidence offered by defendant, well hesitate to hold that there was a marriage, but the claim that there was not is scarcely borne out by defendant's subsequent conduct. It is shown, and not denied, that after said time his attentions to plaintiff and her mother, his apparent care and solicitude for their welfare, suffered no abatement.

There are no letters in the bill of exceptions from defendant to plaintiff written during the year 1905, unless the one hereinafter referred to, dated January 18, was written in that year, although it is apparent that many were written, and frequent payments of money were made to plaintiff to enable her to maintain the household. On the 2d of February, 1906, he wrote her as follows: "Fremont, Neb., February 2, 1906. V. W. Allenspach, 703½ North 16th street, Omaha, Neb. My Dear Val. I just got home last night. Will be down in a couple of days when I get things straightened up here.

We are fixing up horses to have a sale 26th this mo. and I am very busy now. In a few days I will have things in shape. I sent you a check last week for 25 before I left the springs. The springs helped me while I was there, but I am trouble(d) (with) sciatic rheumatism and that will take a different treatment to cure it. I will go down and see you the first opportunity. Hope yourself and mother are well. Give my regards to mother, also self. Hope to see you in the near future. I am, as ever yours." April 19 he wrote as follows: "Fremont, April 19th, 1906. V. W. Allenspach, 706½ North 16th Street, Omaha, Neb. My Dear Val. I will send you down something to-morrow if I don't go down myself. So be good to yourself and don't get restless if I am behind, as I am very busy just now. With love and kind regards to self and mother." On April 21, 1906, he wrote, referring to his last letter, saying he could not come that day as he had to go to Lincoln to get carpenters started to finish the house; that he inclosed his check for 25 and would come over from Lincoln if he could; that the house was now empty and "I will have it finished right away now, so you can get in before the weather gets too warm. I will have them finish up the inside of the house first so you can get in right away. They can finish the outside after you go in. I will be down and talk it over with you soon as I can." On April 29 he wrote her at considerable length, describing his labors in Lincoln cleaning and painting the house, saying that if she did not keep chickens she could get "3 pr. month" for the barn, and stating the number of rooms in the house. He closed the letter with the following language: "Hoping to see you soon. Regards to mother and not forgetting you, dear, I am, yours very truly." On July 21 he writes: "I wrote you a few days ago to know if you wanted me to bring down the dog you spoke of, but did not get any answer from, and also that I would be down Saturday or Sunday, but I got a letter from William Coad yesterday saying he would be here this evening to see me on business, so I won't be

able to get down until Monday, but I will be down Mo. sure. I have been doctoring all week and had to stay in bed two days. I have one pretty lame foot. Hoping to see you soon, I am, yours truly, M. M. Coad. If you get this in time drop me a line and let me know if you want me to take this dog down or not."

These letters are all addressed to "V. W. Allenspach," but the complimentary address is to "My Dear Val" as before. The many orthographical errors have been corrected, otherwise we have aimed to be exact in copying. For want of time and to avoid extending this opinion to too great length many letters are not herein referred to. Such parts of the correspondence as have been omitted are equally free from improper or unseemly references, as are those set out. The question again presents itself: Do these letters impress one as those of a libertine to his mistress, or of a husband to a wife who would be presumed to be interested in his personal affairs, his health, his aches and pains? True there is no reference to a marriage, nor to the married relation, and he has continually addressed her by her former name. If the testimony of plaintiff that all this had been agreed upon in the first instance is to be believed, it furnishes a ready explanation, for she stated that it was feared by defendant that the correspondence might fall into other hands, and for business reasons he desired the marriage kept secret, and when the proper time came to make it known they would take the promised trip to Europe.

We find but three letters from plaintiff to defendant in the bill of exceptions. One dated April 8, 1905, to "My Dear Mr. Coad," signed "As ever you know, yours, Valeria"; another dated August 14, 1907, to "Our Dear Mr. Coad," signed "As ever, you know"; and the other of October 20, 1907, to "Dear Mr. Coad," and signed "Sinc. Valeria W. Allenspach." They are devoted to business matters and throw no special light upon the subject under consideration. That she has written many letters to defendant is clear by his letters to her and the testimony of the parties, but they have probably not been preserved.

This being an equity case, this court is required to re-try the ,cause upon the evidence submitted and preserved in the bill of exceptions and "reach an independent con-clusion as to what finding or findings are required under the pleadings and all the evidence, without reference to the conclusion reached in the district court or the fact that there may be some evidence in support thereof." Code, sec. 681a. While in cases where the evidence is con-flicting we may (and should) consider the findings of the district court (*Wetherell v. Adams,* 80 Neb. 584), yet the burden is, by appeal, placed upon this court to retry the case. That the evidence as to the specific contract of marriage is conflicting there can be no doubt, but that the sexual relations have existed between the parties to a great extent, at least after January 1, 1905, at the resi-dence of plaintiff by the procurement of defendant, and latterly, in the house of defendant, and that during the whole time he has contributed to the maintenance of the household, and that, when present, he has to quite an extent assumed the position of the controller of domestic affairs, is not to be doubted. His letters so indicate, and his reference to plaintiff's mother as "mother" would seem to indicate something of a recognition of the rela-tion insisted upon by plaintiff. From a consideration of the whole record we are unable to give a certificate of high moral character to either party, but when we con-sider, as the evidence shows, that defendant was an ac-quaintance of the family at the time when plaintiff was a child, that he, after the lapse of years, sought and ob-tained a renewal of that acquaintance, and from that time on pressed his attentions upon plaintiff, seeking to keep in touch with her and the family, apparently solicitous for their welfare, never being willing that their relations should be broken off, we are constrained to believe that his purposes were not of the baser sort. On January 18 (year not given) he wrote to plaintiff as follows: "My Dear Val. What in the world is the matter with (you). Are you sick, or have you gone to where your father was,

or what is the delay in writing to me? I have written you three letters. Now, if you get this one, be sure and answer by return mail, as I am uneasy about you wherever you are. Be sure and answer. This is written in a hurry as I am going to the office to-night, and if I don't hear from you I won't know what to think. If you are away you said you would write me, so be sure write, or wire me if you are in a hurry and can't write. Excuse this as I am in a big hurry. Hope to hear from you by return mail. From your friend M. M. C." This may show in some degree the solicitude, often otherwise expressed, on the part of defendant for the well being of plaintiff, and that the desire for close relations were not all entertained by plaintiff. He was a man of mature years, neither in his youth nor dotage, and was not in any sense "captured" by the wiles and blandishments of plaintiff.

On the 13th day of June, 1907, defendant procured from plaintiff the execution of the following instrument: "Received of Mark M. Coad, one hundred and fifty dollars ($150) in full settlement and satisfaction of any and all claims and demands of every nature and description, either of a business or personal nature, which I have or may claim against him. And I hereby acknowledge full payment for any and all real estate heretofore, or on this day deeded by me to Mark M. Coad, and full satisfaction and release of each and every promise that he may have made to me in reference thereto, and in reference to any other matter whatsover, and of any and every cause of action which I have or claim against him growing out of any promise made or anything said or done by him to me prior to date hereof. Dated this 13th day of June, 1907. Valeria W. Allenspach."

The testimony of the notary before whom this instrument was acknowledged was taken in court, by which it is shown that the paper was prepared by an attorney before its presentation for signature, the notary accompanying defendant when he went to obtain the signature. It was shown that, from the conversation then had, the

subject of signing such instrument had been talked of before, but what was said was not made known to the notary. At the time he and defendant were there plaintiff declined to sign, and her mother became strenuous in her objections, and for some purpose stepped into the kitchen, when the door was closed by some one and locked, thus excluding her from further participation in the discussion. The notary was asked what conversation he heard between defendant and plaintiff, or what defendant said to plaintiff "at the time while urging her to sign these papers." The answer was: "Well, the conversation was a long one. They talked about the matter there for at least an hour, I should say, and he was insisting on her signing and she was objecting to it, and so was her mother. Her mother seemed to be more strenuous in the objection than her daughter, and she kept declining to sign, and asked me what I thought about it, and I told her I was not her attorney and did not care to advise her what to do, and Mr. Coad kept urging her to do it, and finally she said to him that her mother thought that they ought not to sign it, because her mother was afraid he was going to put her out of the house and would not support them. Her mother was in the kitchen pounding on the door, and making a loud noise, and Mr. Coad said, 'Haven't I always supported you?' or words to that effect, and she said, 'Yes, but mamma is afraid you will put us out of here and will not support us any more,' and he said, 'You need not worry about that. I will take care of you,' or words to that effect." Plaintiff testified at considerable length as to what occurred and her reasons for affixing her signature, based upon the assurances of defendant and her confidence in him and his promises. We cannot see that this paper is entitled to very much weight or consideration. It is clear that it was reluctantly signed and with a reliance upon the promises of plaintiff that she "need not worry" and that he would "take care" of her. If the marital relation did exist, the instrument was void in so far as it might have sought to

dissolve that relation, and voidable as to the real estate transactions which were concerned. Plaintiff and her mother both testified that defendant returned to the home where they lived and continued his sexual relations with plaintiff, occupying the room and bed with her for two nights. This is denied by defendant, but there are some circumstances which tend, though not strongly, to sustain them. Had a child or children been born, the result of the intercourse between the parties, we think no court would, or could, bastardize them under the evidence. They would have been held born in lawful wedlock and legitimate.

We are persuaded that it would be against the law and its presumptions, as well as against public morals, to hold that the marital relations did not exist between the parties to this suit. The judgment of the district court is reversed, and a decree will be entered in this court finding that that relation does exist, and that plaintiff is entitled to and is given a decree of absolute divorce, that she is entitled to receive and is decreed to have judgment for $20,000 as her alimony in full, and that execution issue for the collection of the same, and that she have judgment for her costs in this case expended.

JUDGMENT ACCORDINGLY.

FAWCETT, LETTON and ROOT, JJ., dissent from the majority opinion in this case.

At the outset it may be said the defendant's testimony convicts him of such shocking immorality that he is entitled to no other relief in a court of equity than the evidence taken all together compels that court to grant. On the other hand, exact and impartial justice demands that, if the evidence does not establish the plaintiff's cause of action, she should take nothing by her writ simply for the reason that the defendant has violated the laws of God and of man. The testimony proves that the plaintiff, preceding her marriage to Col. Hoover in 1901, was a suc-

Coad v. Coad.

cessful business woman; that for some reasons her rela-
tions with Hoover were unsatisfactory, so that in the
spring of 1902 they separated and were finally divorced
in March, 1904. In the meantime the plaintiff and Col.
Hoover engaged in litigation for a divorce, the one party
prosecuting a suit in Douglas county, and the other a
similar suit in an interior county.

In the summer of 1902 the plaintiff met the defendant
at Fremont; shortly thereafter he gave her $10, and fol-
lowed this donation with gifts of sums of money of from
$10 to $100, aggregating many hundreds of dollars. The
plaintiff accepted this money without any protest or
scruple, and plunged into a voluminous correspondence
with her aged admirer. Whether this pursuit culminated
in a marriage depends upon the truthfulness of the
testimony that January 1, 1905, the defendant was pres-
ent in Omaha, then and there entered into a common law
marriage with the plaintiff, and remained in that city for
three consecutive days. The testimony to sustain such
a finding is referred to in the majority opinion. Opposed
to this we have the defendant's positive denial that he
was present in Omaha upon that day or that he ever en-
tered into any such arrangement with the plaintiff, and
in this connection it should be remembered that the
plaintiff made the defendant her own witness and thereby
vouched to the court for his credibility. The record fur-
ther discloses that the defendant during the latter part
of December, 1904, and until January 8, 1905, was con-
fined to his home near Fremont about 35 miles from
Omaha. The physician who treated Coad for a broken
collar bone during this period testified that subsequent to
January 2, 1905, the defendant came to the witness' office
in Fremont for the purpose of having an examination
made to ascertain whether the patient could safely travel
west to attend to his business affairs; that the defendant
then stated in substance it was the first time he had been
away from his farm since the doctor's last visit in De-
cember. This statement was hearsay, self-serving from

23

the litigants' present standpoint and entitled to but little weight, but the proof shows without contradiction that the defendant was injured in 1904 and later departed from Fremont for the west about January 8, 1905. Checks purporting to have been drawn by Coad in Dodge county December 31, January 2, and January 3, in payment of local bills are in the record. The evidence to our minds is persuasive that these checks were drawn by Coad in Dodge county and upon their respective dates. January 1, 1905, was Sunday. On that day the defendant wrote a letter from Dodge county and mailed it to George Robertson at Lawrence, Kansas. Robertson testified that he received the letter January 2, 1905, and the original letter dated January 1, 1905, in the defendant's handwriting is in evidence. Robertson testifies that on the 3d of January, 1905, he received a telegram from Coad, dated Fremont, Neb., January 2, and in response thereto came to Fremont and entered Coad's employ. All of these documents, except the telegram, are in Coad's handwriting and were prepared at a time when the necessity for manufacturing evidence could not have been known to him. The nurse who attended Coad in December, 1904, and in January, 1905, until he went west, testifies positively that the defendant was not away from home January 1, 2 or 3, 1905. The majority opinion states this witness ought not to be believed, but we find nothing in the record to justify such an aspersion; her answers are direct, and she sustained herself well upon cross-examination.

The presumption that the litigants' relations were lawful rather than meretricious, relied upon to sustain a finding against the defendant, to our minds should vanish in the light of the undisputed facts that, while the plaintiff was the lawful, wedded wife of Col. Hoover, she continually accepted money from the defendant, encouraged his advances, and received without objection his letters referring to mutual embraces and describing himself as her lover and sweetheart. The litigants' conduct at all

times repels the thought that they were or are man and wife. No person other than the plaintiff's mother testifies to having heard Coad refer to the plaintiff as his wife; he never held the plaintiff out to the world or to any disinterested individual as his spouse; she has not produced a scrap of paper whereon he described her as his wife, nor does she claim he ever wrote her to that effect; she signed her maiden name to, and acknowledged, deeds conveying her property, and signed that name to hotel registers when away from home; subsequently to this alleged marriage she never darkened the door of the defendant's home except for the purpose of extorting money from him; she remained in that house over night on two or three occasions after January 1, 1905, but never occupied his room, nor did she claim to any one there, not even to her intimate friend, Miss Paxton, Coad's housekeeper, that she was Mark Coad's wife. Indeed the plaintiff does not deny Miss Paxton's testimony to the effect that the plaintiff complained that Coad had promised to marry her. Several letters written to the defendant by the plaintiff subsequent to January 1, 1905, are in evidence, and he is addressed therein as "My Dear Mr. Coad," "Our Dear Mr. Coad," and "Dear Mr. Coad," but in no instance did she address him as husband. All of the letters between the parties were private, and if they were married some expression evidencing that fact would in all probability have appeared in their correspondence. It is true the plaintiff testifies that the defendant assigned as a reason for his desire that their marriage remain a secret that he did not want the fact known until he had settled his business affairs with a brother, but the proof is uncontradicted that he had severed all business relations with his brother 20 years prior to 1905, and, during the period of time covered by the plaintiff's testimony, the defendant's business was under his sole control. The fact that on one or two occasions subsequent to January 1, 1905, he referred to the plaintiff's mother in his letters as "Mother" is not entitled to much weight, because he

described her by that term in at least one letter written before this so-called marriage.

In 1906 the defendant induced the plaintiff and her mother to move from Omaha to Lincoln and occupy a small dwelling owned by him in that city. In June, 1907, as shown by the majority opinion, the defendant settled with the plaintiff for all demands she had upon him. He who runs may read in the written release, signed by the plaintiff at that time, satisfaction for the defendant's unlawful acts as well as for property rights and legitimate demands. At the time this release was signed the plaintiff objected to executing the instrument, not because it belied her present claim and ignored her status as his wife, if any such status existed, but for the reason stated at that time by the plaintiff and her mother that, if the release were signed, Coad would no longer support them. It would seem, if the plaintiff believed at that time she was the defendant's wife, she would have asserted that fact, and would not have signed a paper releasing all claims against a husband whom she well knew was worth almost a million dollars. The fact she made no such claim is convincing evidence against the existence of the marriage relation. It was patent Coad intended to sever their relations and discard her, and her conduct then is entirely incompatible with her testimony now. The plaintiff and her mother do testify the defendant, the night following the execution of that release, and subsequently, occupied the plaintiff's bed, but the defendant denies the testimony, and we are inclined to believe in this particular he told the truth.

Furthermore, about two weeks before this suit was commenced and six months after the settlement in 1907, Robertson, the defendant's foreman, called upon the plaintiff and her mother, and Robertson testifies that the mother, in the plaintiff's presence, stated that "Mr. Coad had not done the right thing by them, and that he had promised to support them with funds, and that he had got all of the property from them, *and that he had even*

*gone the length of promising to marry her daughter, and
had not done so,"* and the plaintiff took no exception to
her mother's statement.   This testimony is not denied by
either the plaintiff or her mother.   The plaintiff cannot
excuse her silence at this time or excuse her mother's
statement upon the theory that they believed the defend-
ant had tricked and deceived her and they thought the
marriage relation did not exist, because each woman has
testified that the defendant explained to them January 1,
1905, that the plaintiff and defendant were entering into
a common law marriage.

Lack of time and space forbids a further analysis of the
evidence, but sufficient, it seems to us, has been shown
to demonstrate that the majority opinion is not supported
by a preponderance of the evidence, and that the judg-
ment of the district court, based upon that evidence and
his observation of the witnesses while testifying in court,
should not be disturbed.