ELVIRA COLLINS, APPELLEE, V. HOAG & ROLLINS, INC.,
APPELLANT.

FILED OCTOBER 9, 1931. No. 27906.

*Dressler & Neely,* for appellant.

*Cranny & Moore* and *O'Sullivan & Southard, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Eberly, Day and Paine, JJ.

Paine, J.

Hoag & Rollins, Inc., appellant, was engaged in constructing the Leavenworth street sewer in Omaha. In January, 1930, an employee, Napoleon Collins, fell 60 feet by the breaking of a steel elevator cable, from which accident he died.

The district court held that Elvira Collins, appellee, was his common-law wife and was entitled to compensation at $15 a week for a period of 350 weeks. The appellant appeals from the judgment of the district court.

Among the errors relied upon for reversal are, as follows: That the evidence is insufficient to support the finding of the trial court that the appellee was the common-law wife of the deceased; that the trial court erred in holding section 42-104, Comp. St. 1929, unconstitutional and void for the reason that it contains a provision adding a fifth class of void marriages to the four classes enumerated in section 42-103, Comp. St. 1929, and makes no mention of section 42-103; that the trial court erred in holding that section 42-104, Comp. St. 1929, is unconstitutional and void for the reason that it is contradictory of section 42-114, Comp. St. 1929, and adds a fifth class of void marriages to those mentioned in section 42-103 and makes no mention of section 42-114.

Was the evidence sufficient to support the finding of the trial court that the plaintiff was the common-law wife of the deceased? A large part of the testimony found in the 175 pages of the bill of exceptions is upon this point and we will review it briefly.

The plaintiff testified that Napoleon Collins was her husband, and that he died January 15, 1930, from injuries

sustained while in the employ of Hoag & Rollins, Inc., in digging a sewer at Seventh and Pierce streets. His skull was fractured, his right hip was broken, his leg broken in two places, one arm was broken, and the ball of one eye was cut, and he died two days after the accident at St. Catherine's Hospital. Collins was earning $42 a week as a common laborer at the time of his death. Plaintiff said that they started living together about July 7, 1929. Her answer to question No. 31 was as follows: "Well, Mr. Collins and I had been going together for some time and he was living on the south side and he came to me and told me that he needed a wife and that I needed a husband, that if I would be his wife he would take me for a wife and support me as such in every way that he could and that we should live together as man and wife."

Plaintiff agreed to the plan and Collins moved into her home, and they lived together as husband and wife until his death at 1213½ South Fourteenth street, Omaha. Mr. Collins paid all the expenses of keeping up the house, they slept together, and Collins held plaintiff out and introduced her as his wife. They both belonged to St. John's Baptist church, and Collins always held plaintiff out as his wife to every one at church. At the grocery stores where they traded they got his checks cashed; Collins worked nights and therefore the plaintiff would do the trading and cash the checks herself. Mr. Collins once had an injured hand and plaintiff went with him to Dr. Redfield's office to get his hand dressed. The doctor's secretary filled out a card and asked, "I suppose this is your wife with you?" and Collins answered, "Yes." The plaintiff and Collins went to the Browning Style Shop to buy a coat. Mr. Harris, the manager, asked, "A coat for yourself?" and Collins said, "No, for my wife."

Plaintiff admitted on cross-examination that she was going to marry a Mr. Terry and the marriage license had been obtained, and Collins told her not to do that, he wanted a wife and was a single man and was more able to support her than Terry, who had a family of five children and could hardly support them, and that if she would give

Mr. Terry up and take him he would do a husband's part by her, which he did. Plaintiff paid part of the funeral expenses for Collins and the balance was paid by the Washington Fidelity Company, in which company Collins had a policy of life insurance. The daughter of plaintiff, Marietta, lived with her and Collins during the time they lived together from July until January, when he met his death.

William Howard testified that he lived at 1309 Pierce street and Napoleon and Elvira Collins lived across the alley back of him. Witness had been at their house and Napoleon Collins introduced Elvira to him as his wife. Napoleon ate and slept there and Elvira Collins did all the housework.

Mrs. Ella Golden lived at 1215 South Fourteenth street in the latter part of 1929, and knew Napoleon and Elvira Collins. They lived in the same yard, the house of witness fronting on Fourteenth street and Collins' house fronting on the alley, and she was over there two or three times every day. Witness had heard Napoleon Collins introduce Elvira as his wife. They held themselves out to the world as husband and wife. This witness belonged to the True Holiness church and was asked question No. 721, as follows: "Well, will you tell the court what you said to the Collinses and what they said to you about the proposition of going through the church ceremony?" Answer: "Well, I says, after he told me, he introduced me, he says, 'Come on, Mammy,'—they all call me Mammy—'I want you to meet my wife.' I went on in the house, and I didn't think for one minute that he had moved, and I looked, I seen his things all there. I says, 'You are?' I says, 'That is wonderful.' He says, 'Meet my wife, Mrs. Collins.' And I says, 'Sure enough?' And she says, 'Yes, we are married; we just talked it over this morning; we are married now.' I says, 'That is wonderful.' And so they went on, and everybody thought he was introducing his wife, Mrs. Collins. I says to him—it was along, oh, I guess, went right after Thanksgiving, pretty close to Christmas, I says to him, 'Wouldn't it be nice for a Christmas present to go through a church ceremony,' I says, 'then you would be

right up to date with the church.' He says, 'Why, it isn't necessary; we are already married and we don't need to do that.' I said, 'That would make you be up with the church,' I says, 'You see, I am married.' He says, 'I am married, too.' I says, 'But I went through the performance.' He says, 'Maybe we will some time, I don't know for sure, but we are already married,' he says, 'That is my wife; I can't do any more for her after I go through that ceremony than I can now.' So we just let it go at that. He said he was already married and wasn't no need of going through."

Dewey A. Campbell lives at 1433 North Twenty-first street, Omaha, and is in the retail coal business at that address. He first met Napoleon Collins some time in July, 1929, at a social affair at the St. John's Baptist church, and Mrs. Collins introduced him as her husband. Witness was at their home a number of times after that. On December 29, 1929, he was there for dinner and Collins told him about the wonderful wife he had and how much he thought of her. He referred to Mrs. Elvira Collins. Collins came out to his church at 2608 Franklin street and he heard him introduce her as his wife to the pastor, Rev. Campbell, saying, "Mr. Campbell, meet my wife, Mrs. Collins," and also heard him introduce her to a couple of the deacons and quite a few others as his wife.

1, 2. The district judge held that the evidence was sufficient to constitute common-law marriage, and this court agrees with him.

The Russell Sage Foundation published a book entitled, "Marriage Laws and Decisions of the United States," and in the introduction to this book it sets out that no solemnization by the church was necessary to the validity of a marriage according to the common law. If the parties agreed in words of the present tense to become husband and wife a marriage was thereby constituted and was valid for many purposes. If the parties agreed to become husband and wife in the future and followed this by cohabitation a marriage was created. Ecclesiastical courts in Europe could compel such parties so married

to go through a marriage ceremony by a priest, but this procedure has never been a part of the American law. In more than half of the states such marriages have been accepted by the courts as valid, in the absence of a statute specifically declaring the nullity of such marriages.

The Russel Sage Foundation also published a book in 1929 entitled, "Marriage and the State," and from the introduction to this book we find that the term "marriage license" had its origin in early English ecclesiastical practice, in accordance with which a bishop's license released candidates for marriage from the obligation of publishing their bans in church, but gradually the regulation of such matters came to be transferred from ecclesiastical courts to the state itself.

In many continental countries the religious ceremony is supplementary to the obligatory civil ceremony, and this continues to this day. In England and the United States the device was adopted of having a marriage license obtainable under the civil law. However, in England such license is not required for a marriage solemnized under the auspices of the church of England. In four New England states the license is called a certificate of intention, and authorizes the marriage ceremony.

"A common-law marriage is a marriage not solemnized in any particular form but based on a mutual agreement, between persons legally capable of making a marriage contract, to enter into the relation of husband and wife. The state is given no part in this arrangement, has no record of it, and no opportunity beforehand to pass upon the qualifications of the parties to it." Marriage and the State, p. 26, note.

Common-law marriages "are unlicensed, unrecorded, and uncounted, but recognized as legal." Marriage and the State, p. 29.

In the Nebraska case of *Olson v. Peterson*, 33 Neb. 358, the prosecutrix in a bastardy case testified that she was not married and the case was reversed because the defendant was not allowed to cross-examine her in regard to a common-law marriage with another man. However,

Judge Marshall gave two instructions touching common-law marriage which are in point. The last half of the sixth instruction reads as follows: "Marriage, as distinguished from the agreement to marry, and from the act of becoming married, is the civil status, condition, or relation of one man and one woman united in law for life, for the discharge to each other, and the community, of the duties legally incumbent on those whose association is founded on the distinction of sex. Marriage does not mean a mere temporary agreement to dwell together for a time for the gratification of sexual or lustful desires, but it is essential that the contract be entered into with a view to its continuance through life, and then be followed by celebration and cohabitation, with the apparent object of continuing such cohabitation through life."

And the seventh instruction reads: "The jury are instructed that if from the evidence in this case they believe that the plaintiff, Ella Peterson, and one Andrew Anderson in good faith entered into a contract to become husband and wife, and in good faith and in pursuance of that contract cohabited, that is, dwelt together as husband and wife, and so held themselves out to those with whom they associated, and that they, in good faith to each other and the community, entered upon the discharge of the duties legally incumbent on those holding to each other the relation of husband and wife, then the jury should find that the plaintiff is a married woman. On the other hand, if the jury from the evidence believe that the plaintiff and said Andrew Anderson merely lived together without any contract to marry, or for the mere purpose of gratifying their sexual desires, or for any temporary purpose, then, although they may have slept together, and called each other husband and wife, such living together, standing alone, would not in any legal sense constitute a marriage, and in that event she would not be considered a married woman."

Judge Norval of this court, in passing on the correctness of these two instructions, said: "These instructions were rightfully given, as in our opinion they fairly express the law governing the facts and are applicable to the testimony in the case."

Other Nebraska cases holding to the same effect are *Gibson v. Gibson*, 24 Neb. 394; *Haggin v. Haggin*, 35 Neb. 375.

In *University of Michigan v. McGuckin*, 64 Neb. 300, where the parties first lived together while each had a spouse living, but after divorces were obtained lived together for many years, and raised a family of five children, our court held that an express verbal agreement was not necessary in all cases, but that such consent might be expressed by conduct as effectively as by words.

This decision was in line with the generally accepted rule of the authorities to the effect that, if the parties desire marriage and do all they can to render their union matrimonial, their continuance thereof after a disability is removed will in law make them husband and wife from the moment that such disability no longer exists. This often occurs when parties living in common-law marriage in a jurisdiction where such marriages are not recognized remove to a state where such a marriage is recognized as legal and continue to live as before. 18 R. C. L. 436, sec. 64.

In *Coad v. Coad*, 87 Neb. 290, it was disclosed that the defendant furnished money for household expenses for plaintiff and her mother, and while the parties lived together as man and wife they agreed to keep their common-law marriage a secret. The district court dismissed the case, but this court granted a divorce, basing it largely upon a number of letters written by the defendant, it being held that they were the letters of a husband to a wife, rather than that of a libertine to a mistress.

It has been held repeatedly that secrecy, unexplained, tends to negative common-law marriage, yet it is not essentially fatal to the claim. *Hulett v. Carey*, 66 Minn. 327, 61 Am. St. Rep. 419, 34 L. R. A. 384.

"Where the facts show that the mutual intention of a man and woman was to consummate marriage, and that they cohabited as man and wife, holding themselves out to the public and to neighbors as such at all times, a common-law marriage is established." *Smith v. Blunt*, 84 Okla. 225.

This court has by many decisions firmly established the

validity of common-law marriages in Nebraska. Not that this court has ever encouraged such marriages, but to the end that innocent children born in such wedlock should not be stamped as bastards, but should be legitimate.

In *Reynoldson v. Reynoldson*, 96 Neb. 270, Charles Reynoldson began an action for divorce in Boone county against his wife, Vivian, on the ground that when she married him she was the common-law wife of James S. Boyer. Evidence disclosed that while in jail at McCook she and Boyer entered into a marriage contract and afterwards occupied the same cell and afterwards lived together in Kearney, Lexington and Gothenburg. This court found that she was not competent to enter into the marriage relation with Reynoldson as she was the common-law wife of Boyer at the time, and held: "The contract requisite to the creation of the marriage relation need not be expressed in any special manner, or by any prescribed form of words, but may be sufficiently evidenced by any clear and unambiguous language or conduct."

In *Bailey v. State*, 36 Neb. 808, the parties lived together from 1866 to 1887, when he deserted her and lived in adultery with another woman, and while the jury found him guilty, this court reversed the judgment and sentence of the lower court. The second paragraph of the syllabus, which has been quoted many times, reads as follows: "Marriage is a civil contract requiring in all cases for its validity only the consent of parties capable of contracting. The fact of marriage may be proved by the testimony of one of the parties."

This decision was followed by *Eaton v. Eaton*, 66 Neb. 676, the fourth paragraph of the syllabus reading: "In this state the only essential of a valid marriage is the free consent of competent parties to live together in the marriage relation."

Such decisions appear to have read into our law the word "only" following the words "to which" in the following section of our present law, to wit: "In law, marriage is considered a civil contract, to which the consent of the parties capable of contracting is essential." Comp. St. 1929, sec. 42-101.

Section 42-103, Comp. St. 1929, reads as follows: "Marriages are void: First. When one party is a white person and the other is possessed of one-eighth or more negro, Japanese or Chinese blood; Second. When either party has a husband or wife living at the time of marriage; Third. When either party is insane or an idiot at the time of marriage. The term 'idiot' shall include all persons who from whatever cause are mentally incompetent to enter into the marriage relation. Fourth. When the parties stand in relation to each other of parents and children, grandparents and grandchildren, brother and sister of half as well as whole blood, first cousins when of whole blood, uncle and niece, aunt and nephew; and this subdivision extends to illegitimate as well as legitimate children and relatives."

A common-law marriage may be proved by showing the express consent of the parties thereto. It is the holding forth to the world by the manner of daily life, by conduct, demeanor and habits, that the man and woman who live together have agreed to take each other in marriage and to stand in the mutual relation of husband and wife.

A man and woman so living together and being so received into society and by their friends and relatives as having and being entitled to that status, the law will, in favor of morality and decency and to the end that their children shall not be bastards, presume that they have been legally married. 18 R. C. L. 428, sec. 57.

3. In examining the amendments as found in chapter 40, Laws 1923, we have been aided by a certified copy of Senate File 92 as originally introduced, and in this the secretary of state shows that the section which is now section 42-104, Comp. St. 1929, had an additional sentence after the word "marriages" in the ninth line thereof, which was, "Common-law marriages hereafter contracted shall be null and void," but before this bill passed the legislature this sentence was deleted. It was therefore clearly the intention of the legislature not to make common-law marriages null and void by the amendments of 1923, or it would have left in the line which was in the original

bill and would have clearly carried out that intention.

The amendments as found in chapter 40, Laws 1923, in our opinion, were for the purpose of strengthening the laws relating to solemnization of marriages, and the clause which has been referred to in the argument and briefs as found in section 42-104, Comp. St. 1929, reading as follows, "and no marriage hereafter contracted shall be recognized as valid unless such license has been previously obtained, and unless such marriage is solemnized by a person authorized by law to solemnize marriages," clearly refers to marriages which are to be so solemnized, and if we imply the word "such" after the first word "no" above set out, and would understand the legislature to mean "no such marriage," in our opinion this would clearly show the purpose of the amendments. If this was not true it would make void section 42-114, Comp. St. 1929, which has provided since 1913 that want of jurisdiction or lack of authority in a justice or minister shall not make a marriage void. It would also affect the validity of section 42-115, Comp. St. 1929, providing that a marriage according to the customs of any religious society, duly recorded in the minutes or book of such society, shall upon being transmitted to the county judge make such marriage legal. And it would in the third place make section 42-101, Comp. St. 1929, meaningless, and also set aside the decisions of our courts thereunder holding that marriage is a civil contract to which only the consent of the parties capable of contracting thereto is essential.

The new act of 1923 did not set out these sections nor amend them nor repeal them, and therefore in our opinion the amendments of 1923 provided definite and positive requirements for marriages which were to be solemnized in accordance therewith, but did not affect other forms of marriage as herein set out, and as the legislature struck out the line which was found in the original bill introduced in reference to common-law marriages, it is our holding that such marriages are legal if they meet the requirements of section 42-102, Comp. St. 1929, and the many decisions of this court relating thereto.

We have cited to us in this connection 36 Cyc. 1144, giving the rules for the construction of statutes, and quoting: "7. * * * Every statute is to be construed with reference to the general system of laws of which it forms a part, and must therefore be interpreted in the light of the customary or unwritten law, of other statutes on the same subject, and of the decisions of the courts."

Also 36 Cyc. 1146: "d. * * * All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed as a part of the general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the Constitution, but also in connection with other statutes on the same subject. * * * Where two statutes are in apparent conflict, they should be so construed, if reasonably possible, as to allow both to stand and to give force and effect to each."

In accordance with the above, the judgment of the district court for Douglas county is

AFFIRMED.

GOSS, C. J., concurs in the result.
ROSE and GOOD, JJ., dissent.