[Civ. No. 14152. First Dist., Div. One. June 13, 1950.]

Estate of A. H. WINDER, Deceased. DOROTHY WINDER SMITH, Appellant, v. RULURA T. WINDER, Respondent.

Dorothy Winder Smith, in pro. per., for Appellant.

Breed, Robinson & Stewart for Respondent.

SCHOTTKY, J. pro tem.—The decedent, A. H. Winder, died on or about March 10, 1948, in Alameda County, California, and thereafter respondent, Rulura T. Winter, filed a petition for letters of administration alleging that she was the surviving spouse of said decedent. Her petition was regularly set for hearing on March 24. On March 30, appellant Dorothy Winder Smith and Beatrice Martens, daughters of decedent A. H. Winder, filed an opposition to respondent's petition, and also a petition for letters of administration for themselves.

The hearing on both petitions for letters and the opposition to respondent's petition were consolidated and set for hearing on April 14, 1948, and were continued to June 29 for trial. On June 29, the hearing was continued to July 6. In the meantime, the Central Bank of Oakland was appointed special administrator of decedent's estate. On July 6, appellant and Beatrice Martens appeared each with counsel who had previously represented them, and substituted a new attorney to appear for both of them, and through said attorney sought a further continuance of the matter. The court permitted respondent to introduce some evidence in support of her petition and then continued the matter to July 8 for the purpose

of allowing appellant's and Beatrice Martens' new attorney to cross-examine respondent and to present evidence. On July 8, the hearing was again resumed and evidence was introduced by respondent and appellant.

The matter was then continued to August 5, 1948, at which time further evidence was introduced and the matter submitted on briefs. The minutes of September 21, 1948, show that on that date the deposition of respondent which had been taken by appellant and the certified statement of Walter G. Purtzer, Clerk of the District Court of Madison County, Nebraska, were admitted in evidence and the matter ordered submitted.

On September 24, respondent's petition for letters of administration was granted and respondent appointed administratrix. On September 27, 1948, the court by a written order found that respondent Rulura T. Winder was the surviving spouse of the decedent, and appointed her administratrix, denied the petition of appellant and Beatrice Martens for letters, and overruled the objections and opposition to respondent's petition. This appeal is from said order, appellant appearing in propria persona.

Appellant has made numerous contentions in her briefs but the principal issues presented upon this appeal, as stated by appellant, are: (1) Was Rulura T. Winder (or Haley, as appellant contends) the common-law wife of Herbert A. Haley by virtue of a common-law reconciliation and remarriage of spouses in the State of Nebraska? (2) Was Rulura T. Winder ever validly married to A. H. Winder? The record is comparatively brief, consisting of a reporter's transcript of 59 pages, a clerk's transcript, and a number of documentary exhibits including the aforementioned deposition of respondent, which is unsigned.

Before discussing the legal questions involved, we shall summarize briefly the evidence as shown by the record. Due no doubt to her inexperience in presenting legal matters, appellant has made many statements as to purported facts which do not appear in the record, which statements, of course, we must disregard.

Respondent Rulura T. Winder, nee Tostevin, was married to Herbert A. Haley in Superior, Wisconsin, on September 30, 1891. One child, a daughter, was born of the marriage. In July, 1903, in an action filed by her in Superior, Wisconsin, respondent was granted a divorce. In 1905, at his request, according to her testimony, she went to Nebraska and joined

Haley, and upon his statement that they would be remarried they lived together as man and wife in Norfolk, Nebraska, from 1905 to 1907. The following quotation from the transcript is illuminating as to the relationship of respondent and Haley during that time: "THE COURT: Why did you live with him? THE WITNESS: I had no choice. I met him in a town in Nebraska and he had become entangled with someone else, so it was impossible to get a new license, and he kept saying, 'I will get it in the next town,' and never got it. THE COURT: In other words, you would have gone through a marriage ceremony with him? THE WITNESS: Oh, yes, I wouldn't have joined [him] if I hadn't expected to. THE COURT: You would have remarried him? THE WITNESS: Oh, yes. THE COURT: But he kept telling you he was tied up with some other woman and he couldn't get a license? THE WITNESS: That is it, exact. THE COURT: You kept on living with him. Let's not be misunderstood. But you understand what 'living with him as his wife' means, don't you? THE WITNESS: Well, he never thought the divorce mattered. THE COURT: I didn't mean that, but, Mrs. Winder—— THE WITNESS: Yes? THE COURT: ——you were divorced from him first, weren't you? THE WITNESS: Yes. THE COURT: All right. Then you went back with him? THE WITNESS: Yes, because he asked me to come. THE COURT: All right. And you lived with him as his wife? THE WITNESS: Yes. THE COURT: All right. And you intended to remarry him? THE WITNESS: Yes. THE COURT: But that was never done? THE WITNESS: No."

In 1907, no license to marry having been obtained by Haley, respondent left him and returned to the home of her parents in Wisconsin, and in March, 1908, a marriage ceremony was performed there between respondent and A. H. Winder. This marriage was made void by the vacating of the divorce decree which Winder had obtained in Nebraska from his former wife, Mary J. Winder. Winder then filed an action for divorce in Colorado against Mary J. Winder and she appeared in said action and was granted a divorce upon her cross-complaint. On May 4, 1911, respondent and Winder were, according to the marriage certificate introduced in evidence, married in Council Bluffs, Iowa. On February 6, 1909, according to the marriage certificate introduced in evidence, Herbert A. Haley was married to one Anna A. Miller in Madison County, Nebraska. The certificate of the Clerk of the District Court of Madison County, Nebraska, stating that there was no record

of any divorce between respondent and Herbert A. Haley between 1905 and 1912, was admitted in evidence, as was also a death certificate showing that Haley died in Madison County on January 26, 1935. Respondent testified that she and Winder lived together as man and wife from 1911 on and that they moved to California in 1912 and were residents of California until Winder's death. Respondent testified that she and Winder took vacation trips each year, usually out of the state, and stayed overnight at various hotels and resorts. She testified particularly as to taking these trips after the date of Haley's death in 1935 and of staying overnight at Las Vegas, Nevada, and at the Grand Canyon in Arizona.

Other facts appearing from the record will be hereinafter set forth.

Appellant's first major contention is that respondent Rulura T. Winder became the common-law wife of Herbert A. Haley when she returned to him in Nebraska after her divorce from him, and that said common-law marriage was never dissolved.

Up to 1923 common-law marriages were recognized as legal in Nebraska. "At common law no formal ceremony is essential to a valid marriage, and an agreement between the parties per verba de praesenti to be husband and wife constitutes a valid marriage, no other ceremony being necessary." (35 Am.Jur. 198.) Although our examination of the authorities convinces us that the decisions of the Nebraska courts as to common-law marriages are substantially the same as in most jurisdictions, including California, since the validity of a common-law marriage alleged to have been contracted in Nebraska must ordinarily be determined in accordance with the decisions of that state (Civ. Code, § 63), we shall quote from some of the numerous decisions of Nebraska courts, cited by appellant, as follows: "Hence, if one party to such relation induces the other to believe in good faith that the contract is made and binding, the law will hold the party taking such advantage to the full terms of the agreement, as in other cases." (*Coad* v. *Coad,* 87 Neb. 290, at 292 [127 N.W. 455].) "The contract requisite to the creation of the marriage relation need not be expressed in any special manner, or by any prescribed form of words, but may be sufficiently evidenced by any clear and unambiguous language or conduct." (*Reynoldson* v. *Reynoldson,* 96 Neb. 270 (syllabus) [147 N.W. 844].) It was held that, during the period when a common-law marriage could be validly consummated, "a man and woman, contractual capables, holding forth to the community by conduct, demeanor,

and habits, that they had agreed to be husband and wife constituted a common-law marriage." (*In re Estate of Tilton,* 129 Neb. 872, at 875 [263 N.W. 217].) "The proof of subsequent ceremonial marriages by each of the parties is evidence to be considered in determining whether a common-law marriage was entered into, but it is not conclusive. . . . The subsequent denial of a common-law marriage by the parties cannot destroy its validity any more than a subsequent denial of a ceremonial marriage can change the status created by it. Public policy forbids that the permanence of the marriage relation, even though entered into under common-law rules, should depend upon any such whimsical contingency. The evidence, if believed, is sufficient to meet the well-stated rules announced in *In re Estate of Lust,* 186 Minn. 405, 243 N.W. 443." (*Wilson* v. *Wilson,* 139 Neb. 153, at 157 [296 N.W. 766].) And in *Collins* v. *Hoag & Rollins,* 121 Neb. 716 [238 N.W. 351], it was held, as set forth by appellant, that where there is no proof of any express contract or oral agreement of marriage and a common-law marriage is to be proved by circumstantial evidence, there must be evidence of cohabitation as man and wife, or the assumption openly of marital duties and obligations, continued for such time and to such extent as to reasonably sustain the conclusion or inference that the parties have agreed to become and be husband and wife, and that the mutual consent of the parties to live as husband and wife may be established solely by evidence of marital conduct.

Appellant has cited numerous other authorities enunciating well-settled principles concerning which there is no dispute. In fact, appellant has presented the issue to this appellate court as though it were being submitted to a trial court. There is no doubt that if the trial court had determined that a valid common-law marriage had been entered into by respondent and Haley in Nebraska and that said marriage had not been dissolved, there would be sufficient evidence in the record to sustain such holding. But the trial court did not so determine, and the question which we must decide is whether, upon the evidence and the inferences that may reasonably be drawn therefrom, and the various applicable presumptions of law, we are compelled to say, as a matter of law, that the order of the trial court is unsupported by the record.

While it must be conceded that the record shows that respondent and Haley lived together as husband and wife after she returned to Nebraska in 1905, yet we do not believe

that such evidence compels the finding that there was a common-law marriage consummated. Her testimony hereinbefore set forth reveals that she lived with Haley in reliance upon his statement that he would get a license and they would be married, but that he was involved with some other woman and did not secure the license. It is fairly inferable from her testimony that while she did live with him there was no intention either on his part or her part to contract a common-law marriage, and that when he failed to keep his promise to get a license so they could have a ceremonial marriage she left him. The fact that Haley himself entered into a ceremonial marriage with another woman in the same county on February 6, 1909, lends support to the conclusion that he did not intend any common-law marriage between respondent and himself. As was said by the court in *Estate of Campbell,* 12 Cal.App. 707, at 708 [108 P. 669, 676] (syllabus): "The presumption of a marriage between A and B, founded simply upon habit and repute, is overcome by proof of a second actual marriage between A and C during the lifetime of B." And in *Estate of Baldwin,* 162 Cal. 471 [123 P. 267], our Supreme Court said, at pages 488-489: "In this state before the codes the common law rule obtained, and this principle of the common law was placed in the code and still remains there, in the declaration that it is a disputable presumption 'that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage.' (Code Civ. Proc., § 1963, subd. 30.) This presumption at common law, as under the code, was disputable, and whenever it conflicted with a higher presumption, as the presumption of innocence where a charge of bigamy was based upon a marriage resting in cohabitation and repute, it fell."

In Restatement of the Law, under Conflict of Laws, it is stated in section 595: "Proof of Facts (1) The law of the forum governs the proof in court of a fact alleged. (2) The law of the forum governs presumptions and inferences to be drawn from evidence."

Section 1959 of the Code of Civil Procedure provides that "A presumption is a deduction which the law expressly directs to be made from particular facts." There can be no doubt that presumptions are evidence. In 10 California Jurisprudence, section 65, at page 748, it is stated: " 'A presumption (unless declared by law to be conclusive) may be controverted by other evidence, direct or indirect; but unless so controverted the jury are bound to find according to the presumption.'

Whether or not a presumption is so controverted is a question of fact for the trial court, and the conclusion of that tribunal is conclusive upon an appellate court unless it be manifestly without sufficient support in the evidence.''

And as was said in the oft-cited case of *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540, at page 549 [299 P. 529] : ''That a presumption is evidence and may in certain cases outweigh positive evidence adduced against it has long been the settled law of this state. [Citing cases.]''

Appellant has cited *Estate of Tersip*, 86 Cal.App.2d 43 [194 P.2d 66], as supporting her position that the proof of the common-law marriage overcame the presumptions herein-before mentioned. Appellant's reliance upon this case and upon *Wilson* v. *Wilson, supra,* which is referred to therein, shows that appellant does not appreciate the difference between an appeal from an adverse judgment and the affirmance of a favorable judgment. In the Tersip case, an application was made to remove Jeanne E. Tersip as administratrix on the ground that she was not the legal widow of the decedent William J. Tersip. Upon the hearing in that case, evidence was introduced indicating quite strongly that she was the common-law wife of one Roberts and that such marriage had not been dissolved. The trial court found that she was the common-law wife of Roberts and had never been legally married to Tersip, and revoked her letters of administration. Upon appeal the order of the lower court was affirmed, the appellate court holding that the evidence sustained the finding that appellant had contracted a common-law marriage with Roberts in Minnesota and was not the wife of decedent. The question of whether a common-law marriage existed was a question of fact in the Tersip case, just as it was in the instant case, the difference being that in the Tersip case the trial court resolved the conflict in favor of the existence of the common-law marriage, whereas in the instant case the trial court held otherwise.

We conclude that the implied finding of the court that no common-law marriage was consummated between respondent and Herbert Haley is supported by the record and the authorities.

Respondent makes the contention that even assuming a common-law marriage was established between respondent and Haley the subsequent marriage of respondent to Winder creates a presumption that the prior marriage was dissolved.

Respondent cites *Mazzenga* v. *Rosso,* 87 Cal.App.2d 790, where the court said, at page 792 [197 P.2d 770] : " 'The presumption of continuance which ordinarily attaches when the relation of husband and wife has once been shown does not apply when the validity of a second marriage is called in question. In such instances the presumption as to the validity of the second marriage displaces the presumption as to the continuance of the first relation. . . .' In so ruling, the trial court followed the law stated in *Marsh* v. *Marsh,* 79 Cal.App. 560, 567 [250 P. 411] : 'It has been held time and again by the supreme court of this state that mere proof of a prior marriage and the continued life of both spouses is not sufficient to make a case against a second ceremonial marriage, that there must be a further showing that the first marriage has not been set aside by judicial decree,' citing *Estate of Hughson,* 173 Cal. 448 [160 P. 548], and other cases. The burden of proof is, of course, on the party attacking the validity of the second marriage. That such is the law, there can be no doubt.''

And in *Kelsey* v. *Miller,* 203 Cal. 61 [263 P. 200], the court said, at page 90: "The mere proof of a prior marriage and the continued life of both spouses is not sufficient to make a case against *a second ceremonial marriage.* There must be a further showing that the first marriage had not been set aside by judicial decree. There is a very strong presumption in favor of the legality of a marriage regularly solemnized.'' (Code Civ. Proc., § 1963, subd. 30; see, also, *Estate of Hughson,* 173 Cal. 448 [160 P. 548] ; *In re Pusey,* 173 Cal. 141 [159 P. 433].)

While it is true that appellant did introduce into evidence a certificate of the Clerk of the District Court of Madison County, Nebraska, certifying that there was no record of any divorce between respondent and Herbert A. Haley between 1905 and 1912, yet it also appears from the evidence that Haley was in the wallpaper business and that while he had his headquarters in Norfolk, Madison County, up to 1907 when respondent left him, he traveled a great deal, and appellant offered no evidence that he was a resident of Madison County continuously between 1907 and the date of the second marriage of respondent to Winder on May 4, 1911.

It was for the trial court to weigh the evidence and the presumptions, and in the instant case we believe that even if the court had concluded that a common-law marriage had been consummated between respondent and Haley (which we are convinced it had not) the court might well have held in

accordance with the presumption that such common-law marriage had been dissolved.

Appellant's second major contention is that respondent Rulura T. Winder was never legally married to decedent A. H. Winder because (1) respondent was still validly married to her former husband, Herbert A. Haley, by virtue of a common-law marriage contracted during a reconciliation of spouses in a common-law state; (2) the Colorado court still retained jurisdiction of the status of A. H. Winder and that of his wife, Mary J. Winder, and the divorce decree which was signed on May 3, 1911, was in effect an interlocutory decree.

We have already determined that there was sufficient evidence to support the implied finding of the court that no common-law marriage was consummated between respondent and Haley.

Appellant next contends that under the decree of divorce in the action of Winder against his wife, Mary J. Winder, which decree was entered in Colorado on May 3, 1911, he could not contract a valid marriage before the expiration of one year, and therefore the claimed marriage of respondent and Winder in Council Bluffs, Iowa, on May 4, 1911, was invalid.

Appellant quotes from section 2122 of the Revised Statutes of Colorado, reading in part as follows: ''In case no appeal or writ of error shall be taken from a decree of the court granting a divorce, the court shall have power to set aside such decree and reopen such case at any time within one year from the date of entering such decree, upon application of the defeated party under oath showing good reason therefor; but if no such application be made within such time, or the same be denied, then such decree shall never be reopened for any cause; and during said period of one year from the granting of a decree of divorce, neither party thereto shall be permitted to re-marry to any other person.''

Appellant also cites *Means* v. *Means*, 40 Cal.App.2d 469 [104 P.2d 1066], in which case the plaintiff obtained in Wisconsin a divorce decree containing a provision that it should be effective only in accordance with the Wisconsin statutes, which provide that a divorce judgment does not become effective until expiration of one year from the date of its entry. Thereafter, the plaintiff moved to California and within the one-year period entered into a marriage with the defendant in Arizona. In affirming the judgment of the trial court that

the plaintiff's previous marriage had not been dissolved and annuling her marriage to the defendant, the appellate court held that the laws of the state of Wisconsin, under which the divorce proceedings were taken, governed the validity of the divorce, and that the Supreme Court of Wisconsin had interpreted the statute to mean that the marriage was not dissolved until the expiration of the one-year period, and that the plaintiff's purported marriage to the defendant was null and void.

Respondent in reply points out that the Colorado statute differs from the Wisconsin statute. Respondent argues that the prohibition against remarriage in the Colorado statute has no extraterritorial effect, and that the courts of Colorado have so interpreted it. Respondent contends that just as in the Means case, *supra*, cited by appellant, the appellate court accepted the interpretation placed on the Wisconsin statute by the Supreme Court of Wisconsin, so should we accept the interpretation placed on the Colorado statute by the Supreme Court of Colorado.

In *Griswold* v. *Griswold*, 23 Colo.App. 365 [129 P. 560], the Court of Appeals of Colorado said, at page 564 [129 P.]: "The provision of our statute invoked for the purpose of nullifying the New Mexico marriage, while it forbids the parties to a divorce suit to remarry any other person within one year, does not in terms suspend the operation of the decree, does not denounce a remarriage within the prohibited time as void, or a nullity, nor make such act criminal, nor attach any penalty to a violation of such statute. (In this respect it contrasts with, and may be tested by, section 4163 prohibiting certain marriages and in terms declaring them absolutely void.) Nor does it in terms apply to such marriage elsewhere than in the state of Colorado. It does not purport to suspend the operation of the decree. It deals with divorced persons. It expressly treats the marriage as dissolved, the decree absolute, final and conclusive, to the extent that even the parties thereto must contract a new marriage as between themselves if they wish to resume their marital relations. The statutory inhibition does not affect the decree." And again, at page 566: "To summarize: (1) The marriage contract in question was valid under the laws of New Mexico, and therefore is valid in this state by virtue of express provision contained in section 4165 above quoted. (2) The provisions of section 2122, prohibiting remarriage within one year from date of divorce, have no extraterritorial effect, do not suspend the operation of the

decree dissolving the bonds of matrimony, and do not affect the marriage contracted in New Mexico, nor in any manner repeal or amend said section 4165.''

The Supreme Court of Colorado held to the same effect in *Loth* v. *Loth's Estate*, 54 Colo. 200 [129 P. 827], and in *Bauer* v. *Abrahams*, 73 Colo. 509 [216 P. 259].

In view of the decisions of the courts of last resort of Colorado, we are unable to agree with appellant's contention that the decedent Winder could not contract a marriage outside of Colorado on May 4, 1911.

Appellant, in a supplemental brief, also contends that the 1911 marriage between A. H. Winder and respondent was invalid on the ground that it was performed in Nebraska under a license issued in the State of Iowa. The marriage certificate, which was admitted in evidence without objection, shows that the marriage was performed in Council Bluffs, Iowa, which is across the Missouri River from the city of Omaha. Appellant argues that an unsigned deposition of respondent, which was introduced in evidence, stated that she was married in Omaha. It was for the trial court to determine as between the marriage certificate signed by the minister who performed the ceremony and the recollection of an aged woman, some 37 years after the ceremony.

In her reply brief respondent makes the contention that the evidence would support a conclusion by the trial court that a common-law marriage arose between respondent and A. H. Winder subsequent to the death of Herbert A. Haley, which, according to the evidence, occurred on January 26, 1935. Respondent bases this contention on the evidence that after said date she and Winder took vacation trips each year out of California and on some of those trips they stayed overnight in Colorado, Arizona and Nevada, states which up to 1943 recognized common-law marriages. We do not believe that, under the authorities hereinbefore cited, such trips, which were merely out of California for brief vacations, could be considered as a basis for establishing a common-law marriage, but in view of our conclusion already reached upon the other points we deem it unnecessary to discuss this contention further.

Appellant's final contention that irregularities on the part of the trial court prevented appellant and her sister from having a fair trial has little merit. The record shows, as hereinbefore set forth, that after two continuances were granted

appellant and her sister appeared with counsel on July 6, 1948; that on that date new counsel was substituted, and said counsel requested a continuance. The matter was partially heard and then continued to July 8, and then continued to August 5, at which time further evidence was introduced. The record shows no request for a further continuance, and no affidavits were filed. There is nothing in the record to show any abuse of discretion or that appellant was in any way deprived of an opportunity to present her case.

■ There was no prejudicial error in admitting respondent's testimony as to "why she lived with Haley as husband and wife." The answers given were certainly material in explaining the relationship of respondent and Haley during that time, even though the form of the question may have been objectionable.

■ Appellant also contends that the court committed prejudicial error by failing to make specific findings on what appellant claims are the material issues. The matters before the court were (1) respondent's petition for letters of administration, (2) appellant's and Beatrice Martens' petition for letters of administration, and (3) appellant's and Beatrice Martens' opposition to respondent's petition. The only allegations in the opposition to respondent's petition were that respondent is not the surviving wife of A. H. Winder and that appellant and her sister are his daughters. The only issue to be determined was whether or not respondent is the surviving widow, and the order made by the court upon that issue was fully as broad as the pleadings in the matter. There is no merit in this contention of appellant.

After the oral argument before this court, appellant filed a "Petition to Reviewing Court to Make Findings of Fact, with Draft of Proposed Findings." Appellant has therein specified 19 separate questions upon which she requests this court to make "separate findings of fact in its decision." Appellant has, of course, mistaken the function of an appellate court, which is to determine whether the order of the trial court is properly supported, but we believe that we have in our opinion answered most of the questions asked by appellant in said petition.

In the instant case a most unusual factual situation was presented to the trial court. Appellant has made an able argument as to why the trial court should have decided in her favor, and this same argument was no doubt presented to the trial court by the counsel who then represented appellant.

However, we are convinced that the question presented was primarily one of fact for the trial court and that its decision is supported by the record. The following language from *Mazzenga* v. *Rosso, supra,* at page 792, is quite apropos: "As noted in respondent's brief, the above argument is, in effect, merely that the trial court 'made its findings upon the *wrong version* of the conflicting evidence.' Since the record discloses substantial evidence in support of the judgment below, such contention on appellant's part, cannot, under the long established rules of appellate procedure, prevail."

In view of the foregoing, the order appointing respondent administratrix is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 13, 1950, and appellant's petition for a hearing by the Supreme Court was denied August 10, 1950.